IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FILED
IN OPEN COURT

SEP 2 7 2023

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Criminal No. 2:23-cr-63 |
| v. | ) |
| | ) 18 U.S.C. §§ 1344 & 2 |
| DION LAMONT CAMP | ) Bank Fraud |
| (a.k.a. "Myles Camp") | ) (Counts One-Seven) |
| | ) |
| Defendant. | ) 18 U.S.C. § 1341 |
| | ) Wire Fraud |
| | ) (Counts Eight-Eleven) |
| | ) |
| | ) 18 U.S.C. § 1028A |
| | ) Aggravated Identity Theft |
| | ) (Count Twelve) |
| | ) |
| | ) 18 U.S.C. § 982(a)(2) |
| | ) Criminal Forfeiture |

**SUPERSEDING INDICTMENT**

September 2023 Term -- At Norfolk, Virginia

**GENERAL ALLEGATIONS**

At all times material and relevant to this Superseding Indictment:

1. Beginning on a date unknown, but believed to be in or about August 2016, and continuing through the present day, in the Eastern District of Virginia and elsewhere, the defendant, DION LAMONT CAMP (a.k.a. "Myles Camp"), devised, and intended to devise, a scheme and artifice to defraud and fraudulently obtain money and property by means of materially false and fraudulent pretenses, representations, and promises from banks, credit card companies, and entities providing auto financing and other loans, and from other individuals, including Jane Doe #2 (JD2), Jane Doe #3 (JD3), Jane Doe #4 (JD4), Jane Doe #5 (JD5), Jane Doe #6 (JD6), Jane Doe #7 (JD7) and others known and unknown to the grand jury.

2. CAMP, JD2, JD3, JD4, JD5, and JD7 lived within the Eastern District of Virginia.

3. Navy Federal Credit Union ("Navy Federal") was a credit union with accounts insured by the National Credit Union Share Insurance Fund. Towne Bank and Bank of America were insured depository institutions as defined in section 3(c)(2) of the Federal Deposit Insurance Act.

4. Ally Bank was headquartered in Utah. Exeter Finance was headquartered in Texas. American Express was headquartered in New York.

## PURPOSE OF THE SCHEME

5. The purpose of CAMP's scheme and artifice to defraud was to obtain money and property to which he was not entitled by coercing and persuading women to obtain money through financial institutions for CAMP's benefit and by directly or indirectly filing fraudulent loan, financing, or credit applications with banks, credit card companies, and entities providing auto financing and other loans.

## MANNER AND MEANS

6. The manner and means by which CAMP carried out the scheme and artifice to defraud included, but were not limited to, the following:

7. CAMP routinely met women, started romantic relationships with them, and then convinced, coerced and persuaded them to obtain money through financial institutions for CAMP's benefit. Specifically, CAMP had the women take out fraudulent loans for cars that were never purchased, or were double-financed, without any intent to repay the loans, and retained all or the vast majority of the money for himself.

8. CAMP feigned to be a wealthy businessman. He would take the women to high-end restaurants and drove luxury vehicles. Often times, CAMP claimed his assets were frozen by the IRS and had tax issues. Thus, he claimed he needed help getting loans or money to resolve those issues. He would promise the women he would repay them for the loans or would give them new cars, but instead left them tens or hundreds of thousands of dollars in debt.

9. CAMP would create fake shell companies, typically LLCs, with names closely resembling that of legitimate businesses in the Hampton Roads area, which he would register with the Virginia State Corporation Commission and would use to facilitate the fraudulent auto loans. CAMP called financial institutions issuing the loans, and falsely represented himself as employees of the legitimate businesses. CAMP also directed the women to establish business bank accounts for the shell companies at financial institutions.

10. CAMP processed monies through another shell entity, Camp Investments LLC, and used UPS P.O. boxes rather than his actual residence address.

11. CAMP often claimed his name was "Myles" CAMP.

**2019 Audi Q3**

12. In or about 2020, CAMP and JD2 became involved in a romantic relationship.

13. On or about July 22, 2020, CAMP created and registered Bryant Motor Sport LLC with the Virginia State Corporation Commission. The name of this new LLC closely resembled that of Bryant Motorsports Auto Sales, which is a legitimate business in Portsmouth, Virginia.

14. CAMP originally listed the registered agent as Jane Doe #1 (JD1) for Bryant Motor Sport LLC. On August 3, 2020, CAMP changed the registered agent to JD2 without JD2's knowledge.

15. On or about May 14, 2020, CAMP had JD2 apply for a loan from Navy Federal Credit Union (NFCU) to purchase a 2019 Audi Q3. NFCU approved the loan in an amount not to exceed $17,100.

16. At CAMP's direction, JD2 signed the NFCU loan check and CAMP filled out the rest, making the check payable to Bryant Motorsports for $16,990. CAMP listed a 2019 Audi Q3 as the car purchased with the check.

17. CAMP had no intention of purchasing the car for which NFCU gave the loan to JD2.

18. On or about July 23 and July 24, 2020, CAMP called NFCU and impersonated an actual employee of Bryant Motorsports Auto Sales, which he falsely represented as the business selling the 2019 Audi Q3. He requested a verification code needed to process the NFCU loan for the 2019 Audi Q3.

19. On or about August 5, 2020, CAMP accompanied JD2 to TowneBank in Virginia Beach, Virginia, where CAMP had JD2 open a business account ending in 6395 in JD2's name and Bryant Motor Sport LLC. CAMP used this account to cash checks from JD2's NFCU loan proceeds.

20. Neither CAMP nor JD2 ever purchased the 2019 Audi Q3.

21. Between August 5, 2020, and August 18, 2020, CAMP had JD2 withdraw all but $365 of the NFCU loan proceeds and give the cash to CAMP.

22. CAMP used physical, mental, and sexual abuse towards JD2 to make her comply with his requests and demands.

**2020 Mercedes-Benz E450**

23. In or about 2020, CAMP and JD3 became involved in a romantic relationship.

24. On or about November 2, 2020, CAMP asked JD3 to apply for a NFCU car loan for a truck CAMP could use for work. JD3 applied for and received a loan from NFCU not to exceed $63,000.

25. JD3 signed the NFCU loan check and CAMP filled out the rest, making the check payable to Bryant Motorsport LLC for $62,066.44. CAMP listed a 2020 Mercedes-Benz E450 as the car purchased with the check.

26. CAMP had no intention of purchasing the car for which NFCU gave the loan to JD3.

27. On or about November 24, 2020 and November 25, 2020, CAMP called NFCU and impersonated an actual employee of the legitimate business Bryant Motorsports Auto Sales, which he falsely represented as the business selling the 2020 Mercedes-Benz E450. He requested a verification code needed to process the NFCU loan check.

28. JD2, who did not know JD3, negotiated this NFCU car loan check into the previously described TowneBank business account. At CAMP's direction, JD2 then withdrew approximately $54,290 in cash from these proceeds, obtained a $30,000 cashier's check in JD2's name, and then deposited the cashier's check into a Wells Fargo joint account ending in 5873 which CAMP established using his and JD2's names. CAMP was the only one who could access the Wells Fargo joint account.

29. Between November 27, 2020, and December 15, 2020, CAMP depleted all funds in the Wells Fargo account.

30. Neither CAMP nor JD3 ever purchased the 2020 Mercedes E450 with the loan proceeds.

31. CAMP used physical, mental, and sexual abuse towards JD3 to make her comply with his requests and demands.

## 2021 Mercedes-Benz GLE350

32. CAMP met JD4 in or about August 2020. They began to date and became involved in a romantic relationship.

33. On or about October 23, 2020, CAMP asked JD4 to apply for a NFCU car loan so she could upgrade her car and buy a Mercedes GLE350. JD4 applied for and she received a loan from NFCU not to exceed $26,800. Under the agreement with NFCU, JD4 was also to provide her existing car, a 2018 BMW, as collateral.

34. On October 27, 2020, after test driving a 2021 Mercedes-Benz GLE350 in Arlington, Virginia, JD4 signed the blank NFCU loan check and gave it to CAMP, who had arranged the purchase in advance and accompanied her to the dealership. Later that same day, per CAMP's direction, JD4 used Mercedes' in-house financing to purchase the 2021 Mercedes GLE350 for $71,435.48.

35. In December 2020, this same vehicle was listed on the previously signed NFCU loan check, which was made payable to Bryant Motor Sport LLC for $26,644. However, the 2021 Mercedes GLE350 had already been financed through Mercedes' in-house financing. The loan check was negotiated by JD2 and deposited into the Bryant Motor Sport LLC's business account at TowneBank. JD2 withdrew the proceeds in cash and provided the money to CAMP at his direction.

36. In order to effectuate the NFCU loan, on or about December 18, 2020, CAMP called NFCU, impersonating an employee at the legitimate business Bryant MotorSports Auto Sales. He requested a verification code needed to process the loan. On or about December 23,

2020, NFCU which had a lien on JD4's 2018 BMW as collateral for the Mercedes loan, released the title to the BMW to the shell business Bryant Motor Sports. The title listed the address of one of CAMP's P.O. boxes at a UPS store in Virginia Beach, Virginia. In January 2021, CAMP used this title to sell JD4's 2018 BMW. On or about January 19, 2021, he deposited the proceeds from that sale, in the form of a check for approximately $31,516 made out to Camp Investments LLC, into his banking account at Bank of America.

37. CAMP used mental abuse and intimidation towards JD4 to make her comply with his requests and demands.

**2021 Lexus ES350**

38. CAMP met JD5 outside an ABC store in or about June or July 2020. They began to date and became involved in a romantic relationship.

39. In or around April 2021, CAMP created and registered Wholesale Direct LLC with the Virginia State Corporation Commission. CAMP listed the registered agent as JD5. The name of this shell LLC closely resembled that of a legitimate business, Wholesale Direct, in Newport News, Virginia.

40. On or about April 23, 2021, CAMP asked JD5 to apply for a NFCU car loan for a truck CAMP could use for work. JD5 applied for and she received a loan from NFCU not to exceed $44,000.

41. At CAMP's direction, JD5 signed the NFCU loan check, which was payable to Wholesale Direct for $43,987. CAMP listed a 2021 Lexus ES350 as the car purchased with the check.

42. CAMP had no intention of purchasing the car for which NFCU gave the loan to JD5.

43. CAMP took JD5 to TowneBank in Norfolk, Virginia, where CAMP had JD5 open a business account ending in 9974 in JD5's name and Wholesale Direct. The NFCU loan check was deposited. All monies that were deposited into this account were withdrawn by JD5 at the direction of CAMP and given to CAMP as cash.

44. Neither CAMP nor JD5 ever purchased the 2021 Lexus ES350 with the loan proceeds.

45. CAMP used mental abuse and intimidation towards JD5 to make her comply with his requests and demands.

**2021 Audi Q5**

46. CAMP met JD6 in high school. In 2020, they began to date and became involved in a romantic relationship.

47. CAMP had JD6 open a bank account with NFCU.

48. On or about June 10, 2022, CAMP asked JD6 to apply for a NFCU car loan. JD6 applied for and she received a loan from NFCU not to exceed $40,000.

49. JD6 signed the NFCU loan check, which was blank at the time, at CAMP's direction. JD6 then mailed the signed, blank check to CAMP at one of his P.O. boxes at a UPS store in Virginia Beach.

50. CAMP made the check payable to Wholesale Direct and listed a 2021 Audi Q5 as the car purchased with the check.

51. On or about June 15, 2022, CAMP called NFCU and impersonated an actual employee of the legitimate business Wholesale Direct, which he falsely represented as the business selling the 2021 Audi Q5. He requested a verification code to process the loan check for the 2021 Audi Q5.

52. CAMP had no intention of purchasing the car for which NFCU gave the loan to JD6.

53. Neither CAMP nor JD6 ever purchased the 2021 Audi Q5.

54. CAMP used mental abuse and intimidation towards JD6 to make her comply with his requests and demands.

### 2022 Mercedes-Benz GLE 53

55. In or around July 2021, CAMP met JD7. They began to date and became involved in romantic relationship. He falsely told her he was a successful businessman whose assets had been frozen by the IRS and asked her to help in.

56. On or about September 17, 2021, CAMP asked JD7 to apply for a NFCU loan for a 2022 Mercedes-Benz GLE 53. JD7 did so and was approved for a loan by NFCU not to exceed $116,000. She signed the blank check and provided it to CAMP. Unbeknownst to JD7, CAMP made the check payable to Wholesale Direct LLC.

57. On or about November 6, 2021, CAMP and JD7 traveled to a Mercedes-Benz dealership in Arlington, Virginia. At CAMP's direction, JD7 used the dealership's in-house financing to purchase a 2022 Mercedes-Benz GLE 53 for $115,966.84.

58. On or about November 24, 2021, CAMP called NFCU and impersonated an actual employee at the legitimate business Wholesale Direct, which he falsely represented as the business selling the 2022 Mercedes-Benz GLE 53. Once CAMP received the verification code for the loan, he had JD5 (who did not know JD7) endorse the check for $110,410, and deposited

9

it into the Wholesale Direct account at TowneBank on or about November 29, 2021. However, the 2022 Mercedes-Benz GLE 53 had already been financed at the Mercedes-Benz dealership.

## COUNTS ONE-SEVEN
### (Bank Fraud)

59. The preceding paragraphs of this Superseding Indictment are hereby realleged and incorporated by reference as though fully set in.

60. On or about the dates and in the manner set forth below, DION LAMONT CAMP, defendant herein, did knowingly and intentionally for the purpose of executing the aforesaid scheme and artifice to defraud and to obtain moneys, funds, credits, assets, securities owned by and under the custody and control of Navy Federal Credit Union, which qualifies as a financial institution as defined under Title 18, United States Code, Section 20, executed each transaction described below for the approximate amount as indicated, by means of materially false and fraudulent pretenses, representations, and promises identified below, and caused the same, each transaction being a separate count of this Indictment as indicated, and aided and abetted the same:

| Count | On or About Date | Description/Purpose of Transaction |
|---|---|---|
| ONE | May 14, 2020 | $16,990 Car Loan for a 2019 Audi Q3 |
| TWO | October 23, 2020 | $26,644 Car Loan for a 2021 Mercedes-Benz GLE350 |
| THREE | November 2, 2020 | $62,066 Car Loan for a 2020 Mercedes-Benz E450 |
| FOUR | April 23, 2021 | $43,987 Car Loan for a 2021 Lexus ES350 |
| FIVE | June 10, 2022 | $39,660 Car Loan for a 2021 Audi Q5 |
| SIX | January 19, 2021 | Deposit of $31,516 check made payable to Camp Investments LLC into CAMP's Bank of America account |
| SEVEN | September 17, 2021 | $110,410 Car Loan for 2022 Mercedes-Benz GLE 53 |

(All in violation of Title 18, United States Code, Sections 1344 and 2.)

10

## COUNTS EIGHT-ELEVEN
### (Wire Fraud)

61. The preceding paragraphs of this Superseding Indictment are hereby realleged and incorporated by reference as though fully set in.

### 2013 BMW 640

62. On or about June 12, 2022, CAMP applied for financing for the purchase of a 2013 BMW 640 from CarMax in Newport News, Virginia. The application was processed by Ally Bank. CAMP falsely stated that he had lived at the same residence for over 23 years, which address was in fact a UPS store, had no rent or mortgage payment, and had been employed as a supervisor at UPS for more than 17 years and earned a monthly income of $5,550. Ally declined the application.

63. When that application was denied, on or about June 30, 2022, CAMP applied for financing with Exeter Finance. CAMP falsely stated that he had lived at the same residence for over 23 years, which address was in fact a UPS store, owns the home and had no rent or mortgage payment, and had been employed as a supervisor at UPS for more than 17 years and earned a monthly income of $5,550. Exeter approved the loan.

64. On or about June 30, 2022, CAMP purchased the 2013 BMW 640 from CarMax for $38,243.88 using Exeter's financing. He eventually gave the car to a family friend. After CAMP was incarcerated, this family friend became concerned about the BMW loan going into default. On or about May 3, 2023, while in federal custody, CAMP used the jail call account of another inmate in order to avoid monitoring by federal agents, whom he knows were monitoring his calls, to call T.A., whom he directed to place a 3-way call with Exeter. In order to obtain an

11

extension on the loan payments due to his incarceration, CAMP falsely represented to the Exeter representative that he was still employed with UPS and that "nothing has changed."

**American Express Application**

65. On or about October 22, 2020, CAMP used the personally identifying information of JD3 to apply for an American Express credit card without her knowledge or consent. The application was filed from an Internet Protocol address subscribed to CAMP. CAMP used his own email address for the application, ensuring all the communications regarding the new card would go to him.

66. On or about November 11, 2020, JD3 filed a fraud affidavit with American Express stating that an American Express card was opened in her name without her knowledge or authorization. After learning of the fraud claim, CAMP physically assaulted JD3 and disputed the fraud allegation with American Express.

67. CAMP made one $9,500 payment on the card's balance on December 4, 2020 from his own Bank of America account ending in 4341. CAMP accumulated a balance of approximately $18,000 on the card, which he never repaid. He used the card for purchases of luxury clothing and other merchandise. On or about December 14, 2020, CAMP called American Express and acknowledged all the purchases on the card prior to that date were his own.

68. On or about the dates set forth below, in the Eastern District of Virginia and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, and representations, and promises, and attempting to do so, DION LAMONT CAMP, defendant herein, knowingly transmitted and caused to be transmitted by means of a wire communication

in interstate and foreign commerce certain writings, signs, signals, pictures, and sounds, as follows:

| Count | On or About Date | Description/Purpose of Transaction |
|---|---|---|
| EIGHT | June 12, 2022 | Application for financing of a 2013 BMW 640 with Ally Bank (attempted) |
| NINE | June 12, 2022 | Application for financing of a 2013 BMW 640 with Exeter Finance |
| TEN | May 3, 2023 | Jail call to Exeter Finance |
| ELEVEN | October 22, 2020 | Credit card application with American Express |

(All in violation of Title 18, United States Code, Section 1343.)

## COUNT TWELVE
### (Aggravated Identity Theft)

69. The preceding paragraphs of the indictment are hereby realleged and incorporated by reference as though fully set forth herein.

70. On or about the dates and in the manner set forth below, in the Eastern District of Virginia and elsewhere, DION LAMONT CAMP, the defendant herein, did knowingly transfer, possess and use, without lawful authority, a means of identification of another, during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), to wit: wire fraud, in violation of 18 U.S.C. § 1343, knowing that the means of identification belonged to another actual person:

| Count | Date of Transaction (On or About) | Means of Identification | Description/Purpose of Transaction | During and In Relation to Felony Violation |
|---|---|---|---|---|
| 12 | October 22, 2020 | Name and Social Security Account Number of JD3 | American Express credit card application | Wire Fraud, in violation of 18 U.S.C. § 1343 (see Count 11) |

(All in violation of Title 18, United States Code, Section 1028A(a)(1).)

13

## **FORFEITURE**

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE THAT:

1.   The defendant, if convicted of any of the violations alleged in Counts One through Eleven of this Superseding Indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of the violation.

2.   If any property that is subject to forfeiture above is not available, it is the intention of the United States to seek an order forfeiting substitute assets pursuant to Title 21, United States Code, Section 853(p) and Federal Rule of Criminal Procedure 32.2(e).

(In accordance with Title 18, United States Code, Section 982(a)(2)(A).)

*UNITED STATES v. DION LAMONT CAMP*
Criminal No. 2:23-cr-63

Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office.

A TRUE BILL:

**REDACTED COPY**

_____
FOREPERSON

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____
E. Rebecca Gantt
Virginia Bar No. 83180
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number - 757-441-6331
Facsimile Number - 757-441-6689
E-Mail: Rebecca.Gantt@usdoj.gov

_____
Elizabeth M. Yusi
Virginia Bar No. 91982
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number - 757-441-6331
Facsimile Number - 757-441-6689
E-Mail: Elizabeth.Yusi@usdoj.gov

15