IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 2:23-cr-63 |
| | ) | |
| DION LAMONT CAMP, | ) | |
| | ) | |
| Defendant. | ) | |

**POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

The United States of America, by and through its attorneys, offers the following with respect to the sentencing factors under 18 U.S.C. § 3553(a) and the U.S. Sentencing Guidelines ("USSG" or "guidelines").

There are two objections to the Presentence Investigation Report ("PSR"). First, the defendant has lodged a blanket objection to the offense conduct, guidelines calculation, and other offense conduct portions of the PSR, and maintains his innocence post-trial. Second, the government objects to the PSR not applying a two-level enhancement under USSG § 2B1.1(b)(16) for an offense involving the risk of serious bodily injury or the possession of a firearm in connection with the offense. Several women reported seeing the defendant with a firearm in furtherance of his ongoing fraud schemes. And, as the Court already held in a pre-trial ruling, physical and sexual assault were an integral part of the defendant's scheme to defraud. Thus, this enhancement is clearly warranted. The government will call a law enforcement witness at the sentencing hearing in support of its objection, and also in support of a request for an upward variance.[1]

---

[1] The witness, FBI Special Agent Newcomb, will summarize the statements of these victims who reported being sexually and physically abused, and evidence regarding the defendant's use of a firearm. His testimony is anticipated to take between 60 and 90 minutes. If necessary,

The PSR determined the advisory guidelines range as 168 to 210 months of imprisonment, plus a 24-months mandatory consecutive sentence for the defendant's aggravated identity theft conviction, resulting from an offense level of 33 and criminal history category of III. If the government's objection were sustained, the revised advisory guidelines range would be 210 to 262 months, plus 24 months.

The government submits that even the revised guidelines range would substantially fail to adequately account for the severe nature of the defendant's conduct. Although the defendant essentially ran a Ponzi scheme, this is far from an ordinary fraud case. As the government's witness is expected to testify, approximately 16 women who he used to commit fraud reported being raped by the defendant, many on multiple occasions, and 3 more reported physical assaults. Particularly egregious, the defendant targeted U.S. Navy servicemembers, knowing they had good credit, steady paychecks, and were fearful of losing their security clearances. Several women reported being raped shortly after undergoing medical procedures, and another reported that the defendant's assaults caused her multiple miscarriages.

Given 1) the defendant's repeated deliberately coercive and cruel behavior over years and its devastating impact on his dozens of victims, and 2) his utter lack of remorse, as shown by his continued false statements to the Probation Office, the government requests an upward variance. Considering the applicable sentencing factors under 18 U.S.C. § 3553(a)—in particular the seriousness of the defendant's offense and the need to protect the public—the government submits that a sentence of imprisonment of 336 months plus the 24-month mandatory consecutive sentence,

---

depending on the nature of the defendant's objections regarding the loss calculation or forfeiture order, the government may also call FBI Financial Analyst Teresa Gillis to testify. Both Special Agent Newcomb and Financial Analysis Gillis testified at the jury trial.

for a total of 360 months—would be sufficient but no greater than necessary to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

## I.    Procedural Background

This case has an extensive procedural history, involving seven attempts by the defendant to challenge the original detention order (including an appeal to the Fourth Circuit), competency proceedings, a motion to dismiss alleging the FBI had searched his home without a warrant despite them having obtained search warrants for both his home and storage unit, and three different defense attorneys.  The defendant has been in local federal custody at WTRJ for nearly 3 years, during which time he committed new federal crimes.  He was convicted after a two-week jury trial of nineteen counts.

*Pretrial proceedings*

On April 3, 2023, the defendant was charged via criminal complaint with one count of bank fraud, in violation of 18 U.S.C. § 1344.  ECF Nos. 3 (complaint) & 4 (affidavit).  He was arrested on the federal warrant on April 17, 2023, following his release from pretrial custody for rape and sodomy charges in Chesapeake.  ECF No. 15 (pretrial report) at 5.  United States Magistrate Judge Lawrence R. Leonard granted the government's motion for temporary detention.  ECF No. 12.

On April 25, 2023, the Honorable United States Magistrate Judge Douglas E. Miller held preliminary and detention hearings in this matter, found probable cause supporting the complaint, and ordered the defendant detained the defendant pending trial, finding both that the defendant was a danger to others and that he posed a risk of nonappearance.  ECF No. 16.  On May 17, 2023, the grand jury returned an indictment against the defendant, charging him with five counts of bank fraud in violation of 18 U.S.C. § 1344.  ECF No. 18.  The indictment charged a scheme to defraud beginning in 2016 and continuing to present, and described that the defendant routinely met

women, pretended to be a wealthy businessman whose assets were frozen by the IRS, and convinced, coerced and persuaded them to take out fraudulent financial loans. *Id.* at 1. He retained all or the vast majority of the proceeds for himself. *Id.* The indictment named five Jane Does, and further alleged that the defendant used "physical, mental, and sexual abuse" or "mental abuse and intimidation" towards multiple victims to make them "comply with his requests and demands." ECF No. 18 ¶¶ 17, 25, 31, 39, & 47.

The defendant was arraigned on May 22, 2023. ECF No. 21. After hearing from both counsel regarding the complexity of the case and continuity of counsel, and with the agreement of the parties, U.S. Magistrate Judge Lawrence R. Leonard set the trial for October 24, 2023. *Id.* On August 31, 2023, the defendant filed a motion to reopen the detention hearing pursuant to 18 U.S.C. § 3142(f)(2). ECF Nos. 36 & 37. The government opposed the motion and on September 22, 2023, Judge Miller denied the defendant's motion. ECF Nos. 38 & 42. On September 27, 2023, the grand jury returned a superseding indictment which added seven new charges, including two new bank fraud charges (18 U.S.C. § 1344), four wire fraud charges (18 U.S.C. § 1341), and an aggravated identity theft charge (18 U.S.C. § 1028A). ECF No. 43. The superseding indictment identified two more Jane Does. Notably, it also charged the defendant with continuing his fraud scheme while in federal custody. *Id.* at ¶ 64. The defendant was arraigned on October 3, 2023. ECF No. 47. With the agreement of the parties, the trial was reset for March 12, 2024. *Id.*

On September 29, 2023, the defendant noted an appeal of the order denying his motion to reopen the detention hearing. ECF No. 46. On November 3, 2023, the Court denied the defendant's appeal, noting "overwhelming evidence that Defendant is a danger to the community." ECF No. 55. On December 11, 2023, the defendant moved the Court to reconsider its order, which the Court denied on January 5, 2024. ECF Nos. 59 (motion), 60 (supporting memorandum), & 72

4

(order).  On December 13, 2023, the defendant filed a motion to dismiss contending the FBI had searched his home without a warrant, which motion the Court denied on January 25, 2024.  ECF Nos. 64 & 75.

On February 21, 2024—three weeks before trial—the defendant filed a motion to continue the trial date.  ECF No. 77 (motion), 78 (supporting memorandum).  The government filed a response noting that it did not oppose a continuance but that given the victims' interests, it requested a trial be set no later than July 2024.  ECF No. 80 at 3.  It also noted that should the Court grant the motion, the government intended on presenting a superseding indictment to the grand jury on March 6, 2024.  *Id.*  Later that day, the defendant filed a waiver of speedy trial.  ECF No. 81.  The Court granted the motion on February 27, 2024, ECF No. 82, and reset the trial for May 14, 2024.

On March 6, 2024, the grand jury returned a second superseding indictment.  ECF No. 84. The indictment added eight new counts: two bank fraud counts (Counts 13 and 14), one wire fraud count (Count 15), and five counts charging false representation of a social security number, in violation of 42 U.S.C. § 408(a)(7)(B).  *Id.*  The indictment added four new Jane Does, see ECF No. 43 ¶ 2, ECF No. 84 ¶ 2, and new allegations that the defendant persuaded multiple women to take out fraudulent personal loans on his behalf, obtained credit cards without women's knowledge, and use false social security numbers on credit card applications and rental property applications.

On March 26, 2024, the defendant filed a second motion for reconsideration of the Court's order denying his appeal of denial of the motion to reopen detention proceedings.  ECF Nos. 88 (motion), 90 (corrected memorandum).  On April 8, 2024, the defendant filed a motion for a competency exam, ECF Nos. 95 (motion); 100 (sealed memorandum), which the Court granted,

ECF No. 107.  On July 12, 2024, the Court denied the defendant's motion for reconsideration, noting that his motion was "the fifth review of pretrial detention in this case."  ECF No. 117 at 6. The defendant appealed to the Fourth Circuit, which affirmed the Court's order on November 6, 2024.  ECF No. 134.

After the completion of the defendant's competency evaluation, the district court held a hearing on August 2, 2024, and found him competent without objection.  ECF No. 125.  It also granted defendant's (second) counsel's motion to withdraw, appointed new counsel, set a new trial date of March 11, 2025, and entered a speedy trial order jointly requested by the parties.  ECF Nos. 128, 130.  On January 10, 2025, the defendant filed a motion for temporary release from custody, which the Court denied, noting that "the issue of pretrial detention has been reviewed five times, and the Court has not varied from the original finding that the Defendant presents both a danger to the community and a flight risk."  ECF Nos. 136, 140.  On February 14, 2025, less than a month before trial, the defendant's (third) counsel filed a motion to withdraw, which the Court denied after a hearing on February 24, 2025.  ECF Nos. 141, 144, & 154.

*Trial proceedings*

The Court ruled on numerous pre-trial motions *in limine* filed by both parties.  *See* ECF Nos. 146 & 170 (government's unopposed motions regarding admission of business records, which the Court granted, ECF No. 171); 145 (government's unopposed motion regarding evidence of abortions, prior legal proceedings involving Jane Does, and consensual sexual encounters, which the Court granted, ECF No. 176); 156 (government's motion to limit certain attorney arguments, which the Court granted in part and denied in part, ECF No. 182).

As particularly relevant here in light of the government's pending objection to the PSR, the defendant moved to exclude evidence regarding the defendant's abuse, as well as Rule 404(b)

evidence which included the defendant's use of a firearm. However, the Court denied such motions, finding such evidence probative of the alleged scheme to defraud. *See* ECF No. 158 (the defendant's motion to exclude Rule 404(b) evidence, namely alcohol use, lies to Pretrial Services, possession of a firearm, prior convictions, and testimony from women other than the named Jane Does, which the Court denied, ECF Nos. 173 & 178); ECF No. 150 (the defendant's Rule 412 motion, as to which the Court deferred ruling, ECF No. 179); ECF No. 151 (the defendant's motion to exclude evidence of abuse of his victims, which the Court denied, ECF No. 177).

The jury trial began on March 11, 2025. In the government's case, approximately 38 witnesses testified, including 14 "Jane Does" and others victimized by the defendant, 14 witnesses from businesses including car dealerships, realtors, UPS, banks, and other companies, and 10 government or law enforcement witnesses. The defendant also put on a case, and called three women, all of whom the defendant had also involved in his fraud scheme. One woman acknowledged her text message to the defendant noting the bruises on her pregnant belly were caused by the defendant.

On March 21, 2025, the jury returned a guilty verdict on 19 of 20 counts: 1) nine bank fraud counts, which involved fraudulent auto loans for ghost or double-purchased cars from Navy Federal Credit Union and fraudulent personal loans from Bayport Federal Credit Union, 2) five wire fraud counts, three of which involved a fraudulent loan extension while the defendant was incarcerated at WTRJ, and two of which pertained to American Express cards, 3) one aggravated identity theft count, involving the use of a Jane Doe's PII, and 4) four counts of false representation of a social security number.

The jury found the defendant not guilty on one count of false representation of a social security number, which involved a realtor rental application.

*Post-trial proceedings*

On August 21, 2025, the defendant moved again for temporary release from custody, which motion the Court denied.  ECF Nos. 208, 210.

On October 10, 2025, the Probation Office filed a PSR determining the defendant's offense level as 33 and criminal history category as III, resulting in a guidelines range of 168 to 210 months of imprisonment, plus 24 months.  The defendant noted his general objection to the PSR, and the government noted its objection to not applying a two-level enhancement under USSG § 2B1.1(b)(16) for an offense involving the risk of serious bodily injury or possession of a firearm in connection with the offense.  On November 4, 2025, the Probation Office filed a PSR maintaining the original calculations.  ECF No. 218.

On October 31, 2025, the government filed its motion for preliminary order of forfeiture, ECF No. 215, which seeks the imposition of a monetary judgment of $1,744,606.28 at sentencing.[2]

On December 9, 2025, the Court denied the defendant's motion for new counsel, following a hearing.  ECF No. 228.  On January 9, 2026, the Probation Office filed a revised PSR that slightly increased the loss amount (with no impact on the guidelines range).  ECF No. 229.

## II.    Standards Governing Sentencing

In fashioning a criminal sentence, a district court must "first calculate the applicable [U.S. Sentencing] Guidelines range."  *United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007).  After calculating the guidelines range, the district court "must give both the government and the defendant 'an opportunity to argue for whatever sentence they deem appropriate.'"  *Id*. (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)).  The district court must then consider all of the factors set forth in 18 U.S.C. § 3553(a) to determine whether those factors support the sentence

---

[2] At sentencing, the government will present a revised forfeiture order increasing this amount by $7,200 to account for an additional victim, JD26, reflected in the most recent PSR.

requested by either party. *Id*. (citing *Gall*, 552 U.S. at 49).  In doing so, the district court may not presume that a sentence within the guidelines range is reasonable.  *Id*. (citing *Gall*, 552 U.S. at 50); *see also Nelson v. United States*, 555 U.S. 350, 351–52 (2009).  Rather, the court "must make an individualized assessment based on the facts presented."  *Gall*, 552 U.S. at 50.

In the event that the district court imposes a sentence outside the guidelines range, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Pauley*, 511 F.3d at 473 (quoting *Gall*, 552 U.S. at 50).  After deciding an appropriate sentence, the court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Gall*, 552 U.S. at 50.  The Fourth Circuit has also held that "a sentencing court  must address the parties' nonfrivolous arguments in  favor  of  a  particular sentence,  and  if  the  court  rejects those arguments, it must explain why in a sufficiently detailed manner to allow this Court to conduct a meaningful appellate review." *United States v. Blue*, 877 F.3d 513, 519 (4th Cir. 2017).

## III.    Objections to the PSR

*Defendant's objection*

The defendant continues to refuse to accept responsibility, and objects to the PSR's stated offense conduct, relevant conduct, and guidelines calculations sections.  The defendant objects to the jury's finding and generally objects to all the factual material in the offense conduct section of the presentence report.  This objection should be overruled absent any affirmative showing of inaccuracy.  *See United States v. Manigan*, 592 F.3d 621, 632 (4th Cir. 2010); *United States v. Love*, 134 F.3d 595, 606 (4th Cir. 1998) ("A mere objection to the finding in the presentence report is not sufficient.... Without an affirmative showing the information is inaccurate, the court is free to adopt the findings of the presentence report] without more specific inquiry or explanation."

(internal citation and punctuation omitted)). The government need not reprove the facts as shown at trial. Rather, the "defendant has an affirmative duty to make a showing that the information in the presentence report is unreliable, and articulate the reasons why the facts contained therein are untrue or inaccurate." *United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990). As such, the Court can rely on the evidence presented at trial and recited in the PSR at sentencing.

*Government's objection*

The government objects to the PSR not applying a two-level enhancement under USSG § 2B1.1(b)(16) for an offense involving the risk of serious bodily injury or possession of a firearm in connection with the offense. "The government bears the burden of establishing the applicability of a sentencing enhancement by the preponderance of the evidence." *United States v. Henderson*, 88 F.4th 534, 536 (4th Cir. 2023). The enhancement reads in full:

> If the offense involved (A) the conscious or reckless risk of death or serious bodily injury; or (B) possession of a dangerous weapon (including a firearm) in connection with the offense, increase by 2 levels.

Both subsections are satisfied here, although as indicated by the term "or," either a risk of serious bodily injury or possession of a firearm is sufficient to warrant application of the enhancement. The guidelines' general definitions define "serious bodily injury" as including "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation," and, as particularly relevant here, "conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or § 2242 or any similar offense under state law." USSG § 1B1.1 cmt.

app. n. 1(M). The defendant's sexual assaults of numerous women, without their consent, clearly satisfies this definition. *See, e.g.*, 18 U.S.C. § 2242(3).

While acknowledging the numerous reports documented in the PSR of the defendant's sexual assaults and his possession of a firearm, the PSR declined to apply the enhancement on the grounds that this conduct "does not appear to be in connection with the offenses for which the defendant was charged." The government respectfully submits that this is based on far too narrow a reading of the term "in connection with the offense" in USSG § 2B1.1(b)(16). In applying this enhancement, the Court is to look not only at the specific offenses of conviction, "but also at all of [the defendant's] 'relevant conduct.'" *United States v. Cadden*, 965 F.3d 1, 34 (1st Cir. 2020).

The defendant was charged in the indictment with fraud schemes he perpetrated through coercive and abusive conduct of women the defendant used to take out fraudulent loans on his behalf. *See, e.g.*, ECF No. 84 ¶ 7 ("CAMP routinely met women, started romantic relationships with them, and then convinced, coerced, and persuaded them to obtain money through financial institutions and other entities for CAMP's benefit, often using sexual assault, physical assault, and/or threats of the same, as well as mental, emotional and psychological abuse."). In response to the defendant's pre-trial challenge to the admissibility of evidence regarding physical and sexual abuse, the Court rejected his arguments that such abuse was irrelevant and barred by Rule 404(b) as extrinsic to the scheme to defraud. The Court held:

> Because the fraudulent loans at issue were executed in the context of Mr. Camp's relationship with the Jane Does, evidence of abuse during those relationships cannot be separated from the charged fraud scheme. Such evidence is intrinsic, because it is intertwined with the charged conduct.

ECF No. 177 at 6. The Court similarly rejected the defendant's motion to exclude firearm evidence, ruling that "[t]he Government may properly introduce evidence that Mr. Camp

possessed a firearm as intrinsic evidence that is necessary to complete the story of the charged offenses."  ECF No. 173 at 8.

This inextricable link between abuse and firearm possession and the fraud scheme, which will further be supported by the testimony by Special Agent Newcomb at sentencing, easily satisfies the applicable "in connection with" standard.  While the government has not located a published Fourth Circuit opinion interpreting this phrase in the context of that specific enhancement, the Fourth Circuit addressed it in an unpublished opinion, holding that "a defendant possesses a firearm 'in connection with' another felony offense when the firearm facilitated, or had the potential of facilitating, the other offense."  *United States v. Gibbs*, 767 F. App'x 513, 514 (4th Cir. 2019) (quoting the relevant enhancement, which was then located in USSG § 2B1.1(b)(15)).  It continued to explain that the requisite relationship exists if the conduct (*i.e.*, the risk of serious bodily injury or firearm possession) "had some purpose or effect with respect to the . . . offense."  *Id.* (citation omitted).  *See also United States v. Agor*, No. CR 21-00136 HG-01, 2023 WL 8780649, at *4 (D. Haw. Dec. 19, 2023), *aff'd*, No. 24-119, 2025 WL 763481 (9th Cir. Mar. 11, 2025) ("'In connection' as provided in Section 2B1.1(b)(16)(B) is not limited to the specific time the defendant committed the theft offense. Acts are 'in connection' with the offense when they are part of the relevant conduct and include acts 'in preparation of the offense,' or in the course of 'attempting to avoid detection or responsibility' for that offense . . . ."); *United States v. Onwumere*, No. 2:24-CR-00019-DCLC-CRW, 2025 WL 3298006, at *4 (E.D. Tenn. Nov. 26, 2025) (considering whether the "fraud scheme inherently or obviously posed a risk of death or serious bodily injury").

As the Fourth Circuit has emphasized in the context of a parallel enhancement in another section of the guidelines using the "in connection with" language, "this standard is not especially

burdensome." *United States v. Bolden*, 964 F.3d 283, 287 (4th Cir. 2020). *See also United States v. Crawford*, 792 F. Supp. 3d 670, 693–94 (E.D. Va. 2025) (noting the wide use of this language across the guidelines and similar interpretation of the provision). As the evidence showed at trial, the defendant's scheme to defraud consistently involved meeting women and developing a coercive relationship, which led them to take out continued loans for him and accept his continued promises to repay. Although the government elected not to introduce this evidence at trial,[3] for a substantial number of these women, this coercive relationship involved sexual assault and rape which he used as a tool of compliance. Similarly, some women reported seeing the defendant with a firearm, which serve to increase their fear of him and made them still more likely to comply with his demands. The requisite connection clearly exists, and the Court should sustain the government's objection.

## IV.    The Statutory Sentencing Factors

### A.    The Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))

As the Court is familiar from the two-week jury trial, for years the defendant engaged in a bank and wire fraud scheme by tricking and coercing women to take out loans on his behalf, especially auto loans and personal loans. As the PSR summarizes, through victimizing financial institutions and over two dozen women, the defendant obtained an astonishing amount of money: over $1.7 million. Without any care, concern or empathy for the women he cruelly left in his

---

[3] Two women, JD2 and JD3 (who were also sexually assaulted) did testify about their physical abuse by the defendant in connection with the fraud scheme. For example, JD3 testified that the defendant "would drag me by the house, out of the front door by my hair. He would push me against the wall, like push my face into the while he was yelling at me." ECF No. 201 at 419. While a transcript of JD2's testimony has not been prepared, to the government's recollection, she discussed the defendant hitting her and threatening to punch her in the face. This and other physical abuse to which Special Agent Newcomb will testify, including the defendant's frequent choking of women, may also arise to a risk of serious bodily injury in addition to the sexual assaults.

wake—broken, discarded, and heavily in debt—the defendant used this money to support his apparent obsession with luxury cars, clothing, and other luxury items.

The defendant had his scheme perfected. As the Jane Does testified at trial, they met the defendant who introduced himself as "Myles" and presented as a wealthy and successful businessman. When they met him, defendant was driving fancy cars, like a Maserati or Mercedes-Benz, and wearing designer clothes. He told them he had one or two children, and that he made money flipping houses. To some of them he showed screenshots of bank accounts or tax returns, purportedly showing he had hundreds of thousands of dollars. With most of the women, a romantic relationship developed, and defendant quickly began assessing the women's creditworthiness, asking them about their credit scores and their salaries. Many of his targets were women with good, steady jobs and good credit, like Navy servicemembers or nurses. As one example of his cruel manipulation, several women testified the defendant told them (falsely) that his own mother had died after they revealed losing a close family member.

The defendant eventually told the women that his assets were frozen, usually through a misunderstanding with the IRS, and asked them to take out car loans, personal loans, or credit cards for him in their names, with a promise to pay them back once he got his accounts unfrozen. Believing the defendant, many women agreed to take out numerous loans in their names on his behalf, quickly withdrawing the proceeds in cash and giving them to the defendant, or handing him over the credit cards. In order to maximize the loan amounts the banks were willing to approve, he would often give the women falsified paystubs or direct them to inflate their income or put other false information in the loan applications.

In some instances, defendant used the women's PII without their knowledge to open new credit cards. With other women, he would encourage them to open an American Express card,

14

and then would obtain a supplemental card on their account using the Social Security number of R.D., who lived in Arizona and never knew the defendant.

Many women inaccurately believed they were in an exclusive relationship with the defendant.  Multiple women reported having an abusive relationship with the defendant, including physical, verbal, and sexual abuse, which the defendant used to keep them compliant with his fraud scheme and perpetuate his control over these women.  Often, the relationship would become abusive once the women began to question the defendant or express reluctance to take out more loans for him.  The defendant, as promised, often made some payments toward the loans for a short period of time, but inevitably left them holding the bag for substantial sums of money, frequently above $100,000.

Much evidence at trial pertained to vehicle loans.  Seven of the bank fraud counts and three of the wire fraud counts stemmed from fraudulent automobile loans for expensive luxury vehicles. The seven bank fraud counts arose from the defendant obtaining six loans from Navy Federal Credit Union ("NFCU") in 2020 through 2022 for cars which were either 1) "ghost purchases," meaning the car was never purchased at all and there was never any collateral securing the loan, or 2) "double-financed" purchases, meaning defendant procured financing both from NFCU and from a Mercedes-Benz dealership for the same car, thereby obtaining both the NFCU loan proceeds and the car itself.  After getting the women to take out an auto loan at NFCU, the defendant used a call-spoofing service to impersonate two local used-car dealerships, getting a code that enabled him to cash the auto loan checks.  He funneled the auto loan checks through Towne Bank accounts he had women establish in the name of phony LLCs whose names closely resembled the auto dealerships.

B. The History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))

The defendant is 40 years old and was born and raised in Hampton Roads. In his presentence interview, the defendant reported the following familial background, which is largely unverified. He stated he was adopted and raised by a foster mother in a loving household, with a childhood free of abuse where all his basic necessities were met. The defendant further reports never returning to his mother's custody, and moving to his father's home when he was 15 years old.[4] The defendant further stated he has a maternal half sister and a paternal half sister, but was unable to provide significant information about them.

The defendant has never been married and has approximately 22 children with multiple women. He repeatedly asserted in his presentence interview that he "has always voluntarily supported" his children, in direct contrast with the evidence at trial that the defendant was over $100,000 in arrears in child support orders. The evidence at trial further showed that only after receiving a notification that his driver's license was about to be terminated, he started using his fraud proceeds to make some cash payments toward the arrears.

The defendant reports graduating from Booker T. Washington High School in Norfolk in 2004. As far as employment, he stated in his presentence interview that he would "sell cars independently" from 2008 to 2013—a "business" that seems entirely fraudulent given his criminal history during that time period, described below—was then unemployed for several years, and then worked at Take 5 Oil Change from 2018 to 2019. (This employment was corroborated by VEC records introduced at trial.) Incredibly, the defendant further maintained in the presentence interview that from 2016 until his arrest, he earned $2,500 a month for his house flipping business

---

[4] Some of this information is inconsistent with the FBI's interview of the defendant's mother in May 2023, as Special Agent Newcomb will testify. It is also worth noting that the defendant falsely told pretrial upon his federal arrest that his mother was deceased. ECF No. 15.

Camp Investment LLC—the same phony business he used to dupe his victims, for forged tax returns, and for which there were no records of revenues or income in any of his financial records or at his home.

The defendant reports being in good physical condition other than hypertension. Regarding mental health, the defendant states he was diagnosed with ADD and ADHD as a child and is interested in mental health treatment. He was evaluated for competency before trial, and was not found to have any mental illness or personality disorder. The defendants reports no history of substance abuse, although multiple women reported the defendant repeatedly consumed alcohol to excess.

The defendant has a criminal history category of III. He has numerous convictions related to driving and child support. Notably, he also has a history of fraud convictions similar to the more recent crimes revealed at trial. In 2011, he was convicted of misdemeanor obtaining money or property by false pretense after he purported to sell a BMW for $18,000, took the money, and never delivered a car. In 2012, he was convicted of the same offense after the same conduct, this time involving an Acura and a new victim. Also in 2012, he was convicted of his first felony, his third conviction for obtaining money or property by false pretenses. Yet again, he took money from a victim after promising them a luxury car (here, a Lexus), but then never gave them a car.

As the Court has already observed during the detention proceedings in this case, the defendant's criminal history also includes a large number of dismissed or nolle prossed charges, including sexual penetration in 2017, forcible sodomy in 2017, assault and battery in 2021, and rape and sodomy in 2023.

C. Other Pertinent Sentencing Factors & Need for Upward Variance

An upward variance is warranted where "the Guidelines range [is] insufficient to serve the § 3553(a) factors." *United States v. Davis*, 130 F.4th 114, 128 (4th Cir. 2025). Here, the guidelines fail to serve two factors in particular: the need for just punishment, 18 U.S.C. § 3553(a)(2)(A), and the need to specifically deter the defendant which would serve to protect the public, 18 U.S.C. § 3553(a)(2)(B) & (C).

Regarding the need for just punishment, the defendant was relentlessly cruel. He sought and exploited hard-working, kind, intelligent women, manipulated and abused them, and then discarded them like trash, just so he could get another Mercedes to drive or Versace bathrobe. The guidelines particularly fail to reflect the sexual and physical assaults he inflicted during his fraud schemes. The only respect in which the guidelines account for this conduct at all is in the disputed enhancement. But even if applied, the enhancement increases the upper end of the guidelines range by only 42 months, or 3.5 years. The government submits this wholly fails to account for the defendant's sexual and physical assaults of nearly 20 women, many of whom were raped repeatedly.

The defendant's extraordinary skills at manipulation and apparent enjoyment in terrorizing women makes him extremely dangerous, and for that reason the government submits that a sentence that would result in the defendant not being released back into society until his mid-60s is necessary to protect the public. This is particularly so because it is clear that only a substantial sentence will specifically deter the defendant. The defendant was previously convicted three times of fraud involving cars, and instead of withdrawing from that conduct he appeared to have learned from it and escalated it to the perfected auto loan schemes proven at trial. The need for deterrence is also shown by his actions post-arrest and even post-trial. Post-arrest, he committed new wire fraud offenses while incarcerated at WTRJ, insisting on a recorded call on another inmate's account that a loan for a BMW should be extended because he still worked at UPS (where he had never worked). Post-trial, he has not shown a shred of remorse. Not only that, but incredibly, in his presentence interview he maintained the same lies that he used in his fraud schemes: that he earned thousands of dollars a month flipping houses for Camp Investments LLC.

## V.     Supervised Release Conditions

To comply with the Fourth Circuit's decision in *United States v. Rogers*, 961 F.3d 291 (4th Cir. 2020), and *United States v. Singletary*, 984 F.3d 341 (4th Cir 2021), the government requests that the Court orally pronounce all conditions of supervised release other than those specifically designated as mandatory under 18 U.S.C. § 3583(d). In addition to an oral pronouncement of the individual conditions, compliance with *Rogers* may be achieved by oral reference on the record to another document, such as the PSR. *Rogers*, 961 F.3d at 299. Here, the U.S. Probation Office has outlined the mandatory and standard supervised release conditions, as well as recommended special conditions, on pages 54 through 57 of the PSR. The government requests that the Court impose all of those conditions.

## VI.    Conclusion

For the reasons stated above, the government submits that a total sentence of imprisonment of 360 months, composed of a total sentence of 336 months on the fraud convictions,[5] plus the mandatory consecutive 24-month sentence for aggravated identity theft, would be sufficient but no greater than necessary to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

LINDSEY HALLIGAN
UNITED STATES ATTORNEY AND SPECIAL
ATTORNEY

TODD W. BLANCHE
DEPUTY ATTORNEY GENERAL

ROBERT K. MCBRIDE
FIRST ASSISTANT UNITED STATES
ATTORNEY

By: _____/s/_____
        E. Rebecca Gantt
        Assistant United States Attorney
        VSB No. 83180
        101 West Main Street, Suite 8000
        Norfolk, Virginia 23510
        Tel. - 757-441-6350
        Fax - 757-441-6689
        E-mail Address – rebecca.gantt@usdoj.gov

---

[5] There are multiple options for fashioning this sentence; one option would be for the Court to impose concurrent sentences of 336 months on each of the bank fraud counts, within-guidelines sentences on the wire fraud counts, and statutory maximum 60-month sentences on the social security number counts.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 9, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record who are users of the CM/ECF system.

I further certify that on January 9, 2026, I will send an electronic copy of the foregoing to the following:

Kalyn M. Monreal
United States Probation Officer

_____/s/_____
E. Rebecca Gantt
Assistant United States Attorney
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Tel. - 757-441-6350
Fax - 757-441-6689
E-mail Address – rebecca.gantt@usdoj.gov

21