**THE UNITED STATES DISTRICT COURT FOR**
**THE EASTERN DISTRICT OF VIRGINIA**
*Norfolk Division*

**UNITED STATES OF AMERICA**

**v.**                                                                    **Case No. 2:23cr63**

**DION LAMONT CAMP,**
                **Defendant.**

## DEFENDANT'S POSITION ON SENTENCING

COMES NOW the Defendant, Dion Camp, by counsel, in accordance with Rule 32 of the Federal Rules of Criminal Procedure, Section 6A1.2 of the Sentencing Guidelines and Policy Statements, as well as this Court's Sentencing Order, and hereby represents that the Defendant has reviewed the Probation Officer's Pre-sentence Report and sets forth the following as his position on sentencing:

For all of the reasons outlined below, the defense submits that a sentence at the low end of the properly calculated guidelines is sufficient and no greater than necessary. 18 U.S.C. § 3553(a). The sentence requested also effectively addresses the other aims of sentencing beyond punishment.

## SUMMARY OF THE TRIAL TESTIMONY

The parties convened on March 11th, 2025 for jury trial. Ashley B. testified that she was in the Navy and stationed in the Tidewater area from 2019-2023. She met Defendant in 2020. 3/12/25 Tr. At 7-9. She stated that they hung out a few months before they became romantic. According to A.B., Defendant owned a real estate and house-flipping business, Camp Investments. A.B. said that they discussed her credit score and that she believed Defendant was financially secure. Id. at 10-11. After a few weeks, Defendant asked A.B. to borrow money because he was having issues with the IRS, and A.B. agreed to take out a $7500 personal loan from NFCU for Defendant. She described applying for the loan on her phone, and she claimed that Defendant had inputted information into the

application.  Id. at 14.  They went to an NFCU branch and took out the full amount tin cash.  A.B. said that she gave Defendant the cash and she kept none of it.  But she admitted that Defendant was repaying the loan for some period of time.  Id. at 15.  She alleged that Defendant urged her to also apply for a car loan for him.  They went to Midlothian to purchase a Mercedes with financing acquired from Capital One.  A.B. identified the purchase order that she signed.  She recalled that they drove the Mercedes home that day but that she never possessed the vehicle.  Id. at 18-19.  In May 2020, he asked her for another car loan, this time to pay for a work truck.  Id.  They applied for financing from NFCU, and A.B. again used the phone app.  She claimed that Defendant had taken her phone and inputted her information and listed her own Ford Fiesta as trade-in collateral.  Id. at 20-21.  A.B. identified the loan check she received from NFCU and agreed that she signed it, although she claimed that the other information had already been filled out before she saw the check.  For example, A.B. averred that the check already listed "Bryant Motorsports" as the payee on the check in the amount of $16,990.  In June or July, they used the check to purchase an Audi Q3.  A.B. claimed that they had to call NFCU about the check and identified Dion's voice on a number of phone calls with NFCU agents.  There was an issue with the loan check by the receiving bank, PNC,  Around this same time, A.B. opened a business account with PNC under the name Bryant Motor Sports LLC.  Id. at 30.  She claimed that Defendant filled out all the paperwork to open the business on his own computer.  Ultimately, PNC refused the check and they took it to TowneBank instead.  They both went inside and opened a Bryant Motor Sports business account with TowneBank.  Id. at 35.  The address on the account was for a PO box that A.B. opened in the business's name.  Id.  They used the NFCU loan amount to open the TowneBank account, and A.B. said that Defendant would take the money to buy the car at auction.  Id. at 36.  A.B. withdrew the money and said she gave it to Defendant, keeping none for herself.  Id.  They took the Ford Fusion to Carmax and sold it, as per the loan agreement.  A.B. received $12,000 for the car in August 2020.  Id. at 38.  A.B. identified text messages from July

2020 asking for money, although she agreed that Defendant was still repaying her at that point. Id. at 40. A.B. stated that they withdrew the NFCU money but that she never saw the Audi. A.B. said that both the NFCU money and the Carmax proceeds were moved into a new Wells Fargo personal account in A.B.'s name. She acknowledged having a card for the account but denied knowing any of the access information. In September 2020, A.B. closed the Towne Bank and Wells Fargo accounts to make Defendant mad. Id. at 46.

The couple went to Tysinger in Hampton to buy A.B. a Mercedes, with Defendant to pay the down payment. Id. at 49. For this loan, they used Ally bank. Although the loan information contained A.B.'s personal details, she claimed Defendant had once again applied for the loan on her phone. Id. On September 1st, 2020, she signed payment documents for a 2017 Mercedes. The purchase price was $25,000, with A.B. and Defendant each making a $1000 down payment. A.B. claimed that they left the dealership with the car that day, but it wasn't until a week later that they paid the down payment. A.B. described receiving a call from the dealership asking about Defendant, and she gave an alternate phone number she knew for Defedant. A.B. stated that Defendant later called her angrily about her giving his alternate number to the dealership and stating that he would punch her if she ever did that again. Id. She then stated that Defendant had previously hit her in May 2020 and argued over who was paying the loan amounts throughout the fall of 2020. A.B. next testified that she was temporarily transferred to Mississippi and while she was gone, Defendant had her sign some blank checks on the TowneBank account.

When she returned, Defendant asked her to go again to Towne Bank to cash two NFCU checks, also purportedly for car loans. A.B. claimed that they went inside the bank and that Defendant pulled the checks out of his pocket and told her to sign them. Rec. at 62. In June 2020, A.B. took out a personal loan from USAA for $9500. A.B. stated that she let Defendant use her credit cards as well. Defendant was still making payments to A.B. until June 2021 on the accounts and

continued paying on the 2015 Mercedes. Id. at 63. In June 2021, A.B. closed the Towne Bank account. Id. at 64, and she also closed the UPS box for Bryant Motor Sports. Id. In September 2021, A.B. sent an email detailing the amounts she still believed she was owed upon. Id. at 65. Finally, A.B. identified herself as participating in a phone call at some point seeking an extension on a loan payment deadline. Id.

On cross, A.B. confirmed that she gave her information to Defendant to apply for the $7500 NFCU loan and that she was aware he was applying for it in her name. Rec. at 70-71. A.B. confirmed that she was already a NFCU member, so much of the information was already known to NFCU. She confirmed that he paid her back between $1000 and $5000. Id. at 66. She agreed that she was present when they applied for the Mercedes loan and that she again provided information for Defendant to do so. Id. at 73. She gave him her information again while they applied for that loan over the phone. Id. She gave her address for the registration and she signed the registration documents. Id. A.B. agreed that she had provided her information to PNC Bank and that she had tried to get them to cash the check in person. She listed the PO Box she had opened as the address. A.B. agreed that she had provided that same PO Box for the LLC registration, id. at 81, and that she had sole access to the box until October 2020. Although she was the one who retrieved mail from the box, she claimed that she merely gave the items to Defendant and never looked at them. Id. at 83-84. A.B. agreed that they received the loan extension for the Audi and that the documentation all referenced Bryant Motor Sports. She agreed that she signed the front and the back of the check, and that the check listed Bryant as the payee, and that she was there in person at Towne Bank when they opened the account and sought to negotiate the check. She agreed that, initially, only she had access to the account, although she then claimed that Defendant obtained access the same day. She maintained that she signed numerous blank checks at Defendant's request and never inquired as to where or when Defendant may have tendered those blank checks. Id. at 90. A.B. reiterated that Defendant had

access to the account, notwithstanding that she also later had to provide him the login info by texts. Id. at 96. She agreed that they sold her car at CarMax and that she signed the check as well as the other paperwork necessary to complete the transaction. Id. at 97. She agreed that she deposited the check at Towne Bank. She agreed that they opened a joint Wells Fargo account but denied that she received a card for that account. Id. She agreed that she signed and deposited two more checks for him in fall of 2020. And, although she stated the relationship was over by January 2021, she agreed to apply for a USAA loan after that She confirmed that he continued to make payments on the cards, even though she still was using them. Id. at 105. A.B. could not give an estimate as to how much Defendant paid back on the loaned amounts and she didn't close the Bryant Motor Sports account until summer of 2021. Id. at 105. In sum, A.B. agreed that her name and address was on all the business filings, that she was the sole person authorized to act in the name of Bryant Motor Sports, that she had signed the front and back of all the related checks, and that her name appeared on the titles of all the vehicles. Id. at 108-109.

The government next called Kevin Klein, fraud investigator for NFCU. He identified a pre-approved check for a car loan as well as a recorded phone call associated with that check. Id. at 120. He also identified a loan application in the name of Shatara S. along with an associated trade-in vehicle listed at $35,000. Id. at 125. Klein also presented a pre-approved check for Shatara S. and identified the phone call to NFCU associated with that date and time. Id. Klein also testified to another check in the name of Rachel N. dated November 2020 and a phone call associated with that check. Id. Klein testified to a number of 2021-2022 transactions involving another entity called Wholesale Direct. Id. at 131. He produced a loan request for Jamilah W. from April 2021 for $43,987, and the associated phone call as well as one for Stacey B. from June 2022 for $39,660, Lavett B. from September 2021 for $110,410. Id. at 133-136.

Beverly Parker, IRS revenue agent, testified next for the Government. She stated that she had found three personal income tax filings in Defendant's name between 2011-2020, filed in 2010, 2011, and 2018. Id. at 145. There were no business filings for either Camp Investments or MXC Properties. Id. at 146.

David Chinn testified next. He was general manager at Bryant Motor Sports Auto Sales. Chinn explained that the dealership dealt mostly in used vehicles under $10,000. He identified the website which listed the available inventory as well as CARFAX reports for the vehicles. Rec. at 150-153. He explained that, when a customer brought a pre-approval check with them, the dealership would call NFCU while the customer was there and ask for the verification code. The dealer needed the verification code to deposit the check. Id. at 154. Chinn reviewed the check purportedly for the 2019 Audi, 2021 Mercedes, and 2020 Mercedes and denied that they had ever sold any cars like that. Id. The government played the NFCU audio calls identified by Klein. Chinn denied being the person on the other end of the line and disclaimed any involvement with those transactions. Id. at 150-159.

Michael Dye testified next for the government. He stated that he had previously been employed with Wholesale Direct Auto Sales from 2020 to 2024. He reviewed the transaction information and phone calls for a 2021 Lexus, a 2021 Audi, and a 2022 Mercedes and denied that they had sold any or that his was the voice heard on the related phone calls. Id. at 160-163.

Jamilah W. testified next. She stated that she met Defendant in an ABC Store in July 2020 and that they began exchanging messages and talking. She said that he was a house-flipper and seemed financially savvy and decent. Rec. at 168-169. She visited his home in Virginia Beach on Oakengate Avenue. In February 2021, Defendant related that he was having issues with the IRS and asked her to take out a loan. Id. at 170. J.W. agreed to take out a $15,000 personal loan which Defendant promised he would pay back once his financial situation improved. Id. at 174-176. She went to Defendant's home to apply for the loans. She put in her personal information, as well as the amount,

which was requested by Defendant. She put in false income information, allegedly at Defendant's direction. Id. at 176. The check arrived by mail and J.W. and Defendant went to Towne Bank to cash it. Id. at 176. J.W. testified that Defendant received all of the money but agreed that he began making payments on the loan. Id. She also received a cash-back credit card, which she stated she gave to him and he made payments upon the balance. Id. She stated that she also received an American Express card at his suggestion. Although the card was mailed to her parents' home, J.W. stated she gave the card to Defendant. Despite having her own card, J.W. stated that she never had access to the account and that Defendant told her only one person could have access. Id. at 184. J.W. testified that they called AmEx to obtain a supplemental card, and that she and Defendant were both on the phone during the call. Id. at 186. J.W. agreed that Defendant made payments on the account and that she did not know the balances when he stopped paying. Id.

J.W. stated that, one day, Defendant took her to a UPS or FedEx store to register Wholesale Direct. J.W. then opened a mailbox for the business at the UPS store. She maintained the key for the box and retrieved the mail. She applied for a credit card in the business name with Chase Bank. Id.

J.W. described that they applied for an NFCU car loan because Defendant needed a work vehicle. Id. at 194. Once they received the loan check, they went to Towne Bank, with the intention to use the NFCU check to open a Wholesale Direct business account. Id. Defendant made payments toward this loan amount, although J.W. did not provide an amount. J.W. testified that they deposited a number of other checks into the account as well, including one for $110, 410. J.W. claimed to have never received any of these funds. Id. at 202. In December 2021, J.W. made a wire transfer for $85,000 to a person named Lavett Brown at Defendant's direction. Id. At a certain point, J.W. closed the Towne Bank account and then opened another one in June 2022. Id. at 205. J.W. and Defendant bought a 2021 Mercedes at a Hampton dealership for $47,000. They also bought a different 2018 Mercedes at an Arlington dealership. Id. at 210. J.W. filed for bankruptcy in August 2022. Id.

On cross, J.W. admitted that she had applied for the first loan through her NFCU account and that she knowingly used incorrect income information. Rec. at 220. She agreed that she went in person to the bank and signed the check. She agreed that she voluntarily applied for the AmEx card. Id. at 222. She authorized for him to be added as a user to the account. He made payments on the account. She opened a PO Box for Wholesale Direct and had the only key for a period of time. Id. at 224, She confirmed that she signed a number of loan and purchase documents but claimed that she never reviewed them prior to signing. Id.

The government next called Stacey B. She testified that she first met Defendant in high school and that he reached out to her in 2020. Rec. at 255. In 2022, she gave him money to help with financial concerns he mentioned to her. Id. at 259. Later, she took out several loans to further help, and admitted that she falsified her income information on those loan applications. Id. She recalled a loan from OneMain as well as a $35,000 loan from USAA. S.B. applied for a car loan while she was on duty in California, and claimed that she sent a blank check, endorsed by her, to Defendant related to that. Id. at 265-266. S.B denied knowing of Wholesale Direct or J.W., whose name ultimately were on the check. S.B bought Defendant a Ducati motorcycle and signed the licensing and registration documents. Id. S.B. estimated that she had taken out over $100,000 for Defendant.

On cross, S.B. acknowledged that Defendant had never threatened or forced her to take out any of the loans, and that initially, they were only talking online and over the phone. Id. at 276. She agreed that she received $3,000 from a USAA loan and that she used her then-husband's information to open an NFCU account. Id. at 277. She agreed that she applied for those loans using her own information while she was in California and that she willingly mailed the amounts to Defendant. She provided an incorrect address on the motorcycle title form, knowing an out-of-state address wouldn't be acceptable. Id. at 283.

Jasper Garrett testified next as a supervisor for Ally Bank. He testified that Ally received two applications for auto loans associated with Defendant but neither were approved.

The government next called Cynthia Flannery from Exeter Finance. She testified to a loan application submitted by Defendant. Rec. at 303-305. She stated that a loan, in the amount of $40,829, was approved in June 2022. Exeter sent out notices that the loan was in default in September 2022 and January 2023. Id. at 306. She described a phone call made while Defendant was incarcerated and seeking an extension on the loans. Id. Among other things, during the call, the Exeter representative asked Defendant whether he was still employed in the same way as what he had included in the application, and Defendant confirmed that "everything is the same". The extension was approved, but the vehicle remained in default and was subject to repossession.

On cross, Flannery agreed that she didn't know who actually input the loan information. She also agreed that a payment was made on the loan on the same day as the phone request for extension. Id. at 314.

Lloyd Vaughn testified next. He knew Defendant most of his life and testified that he bought a BMW from Defendant in 2010. The car had a few issues and he returned it to Defendant. Defendant promised to find him another car and, in 2022, he gave Vaughn a 2019 BMW convertible. Id. at 319. Vaughn stated that the title remained initially in Defendant's name, but that he expected the title would be transferred to him once Defendant had paid off the debt. Vaughn identified his voice on a call where Defendant was incarcerated and Vaughn made payment on the BMW. Id. at 327. Vaughn still had the BMW and the loan amount was around $13,000.

The government next called Leesa Chapman as witness. Chapman worked for TowneBank from 2017 to 2022 and met Defendant in 2017 or 2018. She recalled that he was in the bank to open a business account for his car selling business. She stated that he also came back later with two separate females to open another business account for Wholesale Direct and Bryant Motor Sports.

Id. at 340.  She agreed that neither women seemed in distress or unwillingly there while opening the accounts.  Id. at 348.

Sylvia Eubanks was the next government witness, who owned a UPS Store in Virginia Beach.  Eubanks averred that Defendant rented a mailbox at the store.  She also recalled that he came into the store with several females who got mailboxes too.  Id. at 356.  She stated that Defendant would come in once a month on average and retrieve packages which he would open in the store.  She also saw several women come and pick up mail from the box.  Id.  She indicated that the box was still open, and Defendant had paid ahead for it, although he was incarcerated.  Id.

Norvie Ramos, property manager for Source Realty and realtor, testified next.  Defendant had contacted her in 2022 about one of her rental properties.  Rec. at 348.  She believed that Defendant worked for a rental company himself.  Id.  She reviewed the rental application and recalled that someone else may have filled the application out for him.  Id. at 372.  She indicated that she would verify a person's employment history  income based on their tax returns.  She spoke with Defendant's former landlord, Glenn Ryder, who highly praised Defendant as a renter.  She did not run Defendant's credit before approving the application, but he gave her a credit report that he had brought with him.  Id. at 376-378.  Ramos approved the application and rented the property to Defendant starting December 19th, 2022.  She stated that Defendant paid his rent until March 2023.  When the payments stopped, Source ran a credit report and background check.  However, those reports indicated that no social security number had ever been issued in the number provided on the application.  Id. at 388.

On cross, Ramos agreed that she never asked Defendant about the SSN issue and recalled that someone else may have filled out the application for him.  She agreed that nothing about her interaction with Defendant raised any red flags for her.  Id. at 390-392.

Glenn Ryder, Defendant's former property manager, testified next.  Rec. at 395.  He identified the rental application and stated that he believed Defendant had provided his own credit report when

applying. Id. at 399. Defendant listed his occupation as an investor, and owner of Camp Investments LLC, with an annual income of $266,000. Defendant indicated he had a CPA assist him with documents and he produced a corporate tax return. Id. at 400. Defendant paid his rent on time, except one time in June 2022, where Defendant indicated he had been traveling and lost his ID. Id. at 402-405. Ryder had no issues with Defendant while he was renting the property and Defendant made improvements to the landscaping and home security system. Id. at 405.

Rachel N. testified next. Rec. at 407. She stated she met Defendant in June 2020 and they dated from August to December 2020. Id. at 409. He told her that he remodeled houses and sold them. R.N. was an insurance agent and owned her own home, her own car, and had a credit card when they met. Id. at 412. About a month into the relationship, Defendant told R.N. that he was having financial issues. Id. She said that Defendant asked her to take out a personal loan for him and that he would be able to pay her back in November. Id. She applied for the loan on her phone and was approved for $20,000. She also testified that she let him use her credit card for business-related expenses. Id. She claimed he also asked her for a cash advance for $3000. Id. at 416. R.N. got a second NFCU card at Defendant's suggestion, but she claimed that only Defendant ever possessed it Id.

R.N. alleged that Defendant physically abused her starting in October. Id. at 419. She stated that Defendant owed her almost $24,000 from the loans and purchases he made. Id. at 420. She testified that Defendant would often show up and tell her to get him a cash advance or to go with him to the bank. Id. at 425. She described that they went to get a work truck for Defendant. Id. They applied for a NFCU loan in November 2020. She signed the check, which indicated it was not to exceed $63,000 and was for a Mercedes truck. R.N. denied that they ever purchased that vehicle. She stated that they later went to a Chrysler dealership to look at a truck. R.N. claimed that she stayed in the car while Defendant went inside the dealership. She claimed that Defendant took her phone and

inputted some information and told her to respond according to the information he put into her phone. Id. at 430. They went inside and R.N. signed financing documents for a Ram 1500 truck that she stated were already filled out before she came in. Id. at 432. R.N. agreed that she signed the documents and affirmed the information, even though she denied that they were accurate. Id. They did not receive the truck that day since R.N.'s credit had previously been frozen for other reasons, but they picked it up a few days later.

They also went to a Mercedes dealership in Arlington. Rec. at 435. R.N. claimed that Defendant ordered her to go and, upon arrival, told her not to "try any funny business" and just to do what he said. Id. at 439. She claimed that the dealership already had her pseronal information and that she provided nothing to them for the application. Id. The dealership sold them a 2019 Mercedes for over $142,000 and R.N. said that Defendant drove it home and she never had it.

R.N. next alleged that Defendant opened an American Express card in her name and without her knowledge. Id. at 442. She stated that she cancelled the card when she found out and that Defendant grabbed her by the back of the neck when he found out. Defendant texted her that cancelling the card negatively impacted his son and his business. R.N. agreed that she called Amex and re-activated the card. Shortly thereafter, she also agreed to add Defendant as an authorized user on the account. Id. at 446. R.N. denied that she ever possessed the card or that she received any statements from the account. Id.

R.N. identified a written, notarized, agreement where Defendant promised to repay R.N. for the 2019 Mercedes. Id. In December 2020, R.N. got a new phone number with which she communicated with Defendant. R.N. testified that the relationship ended mid-December 2020 and she ultimately filed for bankruptcy. Id. at 458.

On cross, R.N. re-affirmed that she had her own house and car and that only the downstairs of her home was undergoing significant remodelings. Rec. at 467-468. She agreed that her family and

friends also lived in the area.  Id.  Although she identified several money orders purportedly for the $3000 debt, R.N. couldn't confirm — although she did not actually deny – that she had received that money back from Defendant.  Id. at 470.

She maintained that she didn't realize that cancelling the AmEx card would affect Defendant's business, even though she also testified that she already knew that Defendant had opened the card without her knowledge.  Rec. at 478.  And, despite saying earlier that Defendant was on the call with her, she agreed that she had texted him that she cancelled the card afterward, indicating that he was not on the call after all.  Id. at 479.  Further, although she earlier claimed that she never had possession of the new card, she admitted that the card was sent to her address.  Id.

She also re-asserted that Defendant took her phone while she was outside the Chrysler dealership, inputted her information for the credit application, and then sent it to his own phone.  Rec. at 479.  She had no explanation for why he would do that.  She agreed that she was aware he had cards, and she merely said by text that he needed to be repaying those debts.  Id. at 481.  She also agreed that she was with Defendant when they had the NFCU check re-printed and affirmed that she probably received $5000 in exchange for her paying the down payment on the Arlington vehicle.  Id.  R.N. agreed that she cut her leg with a boxcutter and sent pictures and texts related to that to Defendant's phone on November 8th, 2020 while sitting in his driveway.  Defendant wasn't home at the time.  Id. at 488.  She also confirmed a string of texts dated November 20th, 2020 where both sides expressed love and longing for each other.  Id. at 493.  She agreed that, despite earlier saying that Defendant told her to get a new number, she texted him that she got a new number and spoke about how devoted she was to him.  Id. at 495-496.

FBI Special Agent Jennifer Bach testified as a case detective.  She indicated she was present during execution of a search warrant at Defendant's home in April 2023.  Rec. at 515.  Among items found at the home were vehicles, a motorcycle, and documents related to the loan applications and in

the name of Bryant Motorsports and Wholesale Direct. Id. at 5115-525. Among other things, Bach testified that they found a work invoice for a Mercedes GLE 350 in the name of Shatara S. Id. at 531. They also found trade-in paperwork for a BMW x5 which was in the name of Shatara S. and Karrem S, her husband. Id. Bach stated that she interviewed Shatara and reviewed a loan agreement whereby Camp Investments agreed to pay Shatara for the x5. Id. The loan agreement provided that the parties would jointly rehab a property and use the proceeds to pay off the loan. In the meantime, Camp agreed to make payments. Bach further described finding a loan document between Camp and Exeter Finance regarding the x5. She stated agents found cash wrappers and ATM deposit slips throughout the house. Agents found luxury items and receipts documenting purchases of those items.

During the investigation, agents determined that Defendant had 22 children. They learned that he had thousands of dollars of outstanding child support arrears. Rec. at 550. Bach identified two American Express cards that were of interest to the charges, specifically one that appeared also listed on a receipt for a storage unit and work done at a Mercedes dealership. Id. at 552-555. Agents further found a settled debt letter signed by Defendant and Jamika B. agreeing that Defendant had paid off his debt to her. Id. Agents located electronic devices, a laptop, computers, and phones. Id. to 565. They also found receipts and documents associated with MXC Enterprises and Camp Investments. Id. at 567. Inside the house were also located 2018, 2020, and 2021 tax returns for Camp Investments. Id. One month later, the FBI executed a search warrant at Defendant's storage unit. Rec. at 570.

Bach agreed that the information on cars, such as VIN, mileage, approximate price were all publicly-available information and anyone could find them if they knew how to look. Rec. at 572-573. She agreed that at least one of the work orders, for the 2021 Mercedes, was paid for by Defendant although he did not own the vehicle himself. Id. She affirmed that the promissory agreement between Defendant and Shatara S. provided that both sides would share payments and then pay the NFCU

loan off once they had fixed and sold the foreclosed property. Id. She agreed that the bank slips showed that currency was often given to him in straps and that money was commonly strapped by the banks. She agreed there was no Maserati registered to him nor listed on the personal property tax forms. Id. Finally, she agreed that there was at least an $800 payment made on a 1ˢᵗ Advantage loan and that she had no indication that the pre-approval check in Ex. 2120 was ever cashed. Rec. at 580.

John Bell testified as a UPS agent. Rec. at 584. He stated that he pulled employment and income records for the relevant time period. He reviewed several paystub in the name of Chyna B. and denied that UPS had a record of that person. Id. He testified similarly regarding a pay stub in Defendant's name. Id. He agreed that he did not have access to all of UPS's employment records and that it was possible that Defendant had once worked for UPS. Id. at 592.

Alvin Daniels, a car salesman from Arlington testified next. Rec. at 593. He advised that Defendant inquired about a particular car at his dealership. He recalled that Defendant had an investment company, Camp Investments. Defendant negotiated the price of the vehicle and told Daniels that his girlfriend would come get the car. Ultimately, Defendant came in with his girlfriend to finance the vehicle. Id. at 597. Daniels identified the purchase order for a Mercedes GT 63. He agreed that the purchaser was Rachel N. and that she had also completed the online application. Id. He had written "Notaro Investments" on the application as Rachel N.'s source of income based on what she told him. Daniels recalled that Defendant did most of the talking. Daniels recalled that Defendant bought two other cars from him, and on each occasion a woman was on the purchase or financing paperwork.

He referenced a 2021 Mercedes GLE purchased by Shatara S. Rec. at 603. He also identified a credit application and explained that, once submitted, the financing office would try to match the application with whatever bank was willing to accept it. Id. He also identified a purchase order for

Jamila W. to an E400 Mercedes coupe, although he was not directly involved in that sale. He did sell another vehicle to Lavett B. Id. at 606.

On cross, Daniels agreed that he had known Defendant from prior car sales. Rec. at 608. He agreed that none of the women seemed distressed during the purchases. He agreed that he believed Defendant was brokering the car purchases for the women, and in those situations, typically the salesperson would deal mostly with the broker. Id. at 610. He agreed that car information, such as year, make, model, and VINs appeared on his website and others as well and was publicly available. Id. at 611.

Kareem Scott, separated husband of Shatara S., testified next. He said that he and Shatara had bought a BMW x5. Rec. at 614. They both owned it, but she took it when they separated. She paid for it and he considered it to be her car. He was not aware that she sold it. He denied that he signed any paperwork relating to that sale. Id. at 615. He saw that the Certificate of Title showed Camp Investments as the buyer, and he disclaimed the signature on his line.

Naia J. stated that she met Defendant in 2022. They had an intimate relationship for 3 or 4 months and Naia believed him to have money. Within a few weeks, she said Defendant started asking her about money and eventually she agreed to take out a loan for him. She applied for a NFCU loan. Rec. at 630. He drove her to pick up the check and she signed it and gave it to him. Id. at 631. She took out additional loans for Defendant. They did a Bayport loan, where she recalled that Defendant told her what information to put in and she did. Defendant drove her to the branch and she gave him the check. Id. at 634. Defendant promised to repay the loans when he got the money. They took out a loan from 1st Advantage and Lendmark as well. These applications all were submitted from Naia's phone. She said she asked Defendant to pay her back and he never did.

She conceded on cross that she knowingly submitted false information on the NFCU loan application. Rec. at 643. She admitted, after reviewing text messages, that she had actually driven to

the NFCU on her own. Id. at 644. She also admitted, again after texts review, that she was actually inside Bayport when she was applying for that loan. Id. She agreed that Defendant had bought her new car tires and a massage. She was unsure whether she was at Bayport alone, despite texting him that she was there at the time. Id. at 649. She denied that Defendant ever physically abused or threatened her. She agreed that Defendant told her at one point to get her check, but she declined to do so. Id. at 653.

Tylia J. testified next that she met Defendant, who she knew as Myles, in 2018. Rec. at 656-657. They met at a car wash and she believed him to be wealthy based on his appearances. At a certain point, he said he had IRS problems and asked her to help him out. She opened an NFCU credit card for him and gave it to him. Id. at 662. She took out loans from Omni Financial and Lendmark for approximately $30,000. She stated that Defendant had helped her by saying she should falsely claim income, and that she was receiving child support. Id. at 665. They broke up after an argument about a failed NFCU car loan check.

On cross, she agreed that they both used the NFCU card. Rec. at 674. Although she claimed that he submitted the applications with her information, she acknowledged that he was actually texting her information to input. She agreed she might have done the applications herself. Id. at 675-676. She was aware the loans were obtained with fraudulent information and nonetheless she got the checks. Id. She agreed that the car loan check expired and was never used. Id. at 677. She agreed that Defendant had helped her purchase a new car from Checkered Flag. Id. at 679. Finally, she agreed that Defendant never hurt her, that she wasn't afraid of him, and that she never saw him with a gun. Id.

Shelley Anderson, asset forfeiture investigator with the FBI, testified next. She found business registration documents for several Defendant-associated businesses: Camp Investments, Buytel Direct, and MXC Properties. She also found registration documents for Whoelsale Direct and Bryant

Motorsports. Bryant was initially registered with Ashley S. as agent, and later Ashley B. Rec. at 686. She also identified Virginia Employment Commission records related to the investigation. She averred that Defendant had only reported about $6000 in wages over the previous five years. Neither Camp Investments nor MXC reported any wages paid during that period. She found no recorded properties in Defendant's personal nor business names. She found no record of any tax liens for Defendant.

On cross, she agreed that she found a total of four other registered businesses using the name Wholesale Direct, none associated with Defendant. She also agreed that, if a company was involved in renovating only, they wouldn't show up in the property ownership records. Rec. at 694.

Darren Spencer, FBI digital forensic examiner, testified next. Rec. at 695. He assisted executing the search warrant at Defendant's house and assisted in extracting some of the devices. He extracted several phones and computers with emails and usernames associated with Defendant.

Pearl King was the next witness. Rec. at 724. She was a Fraud Manager for Bayport Credit Union. She reviewed loan documents related to Kaliyah D. The application listed employment with Massage Envy and was accompanied by a pay stub indicating the same. The bank approved a $2000 personal loan. Id. at 731. Bayport also provided documents for Chyna B. The application listed UPS as employer.

On cross, she agreed that she couldn't tell whether the Kaliyah application was submitted online or in person. She explained that, if it was done online, the applicant inputs the information. But, if it was in person, the applicant would relay the information to the clerk. She could not say whether the pay stub was submitted at the time of application or after. Rec. at 737.

Nadia F., who met Defendant in 2016, testified next for the Government. Rec. at 740. Defendant was working at Take 5 at the time, and he explained that he was having some financial issues. Id. at 742. They dated for a while and then reconnected in 2023. Id. at 743. At that point, Defendant's financial situation had improved. However, due to an ongoing child support case,

Defendant advised his funds had been frozen. Nadia was in California at the time, and they spoke every day. During one of her trips to Virginia, Defendant asked her to take out a NFCU loan and they filled out the application together on her phone. Nadia F. also helped him make a wire transfer shortly after she arrived in Virginia. Defendant provided her, by phone, the account information to which the money was being sent. Id. at 748. She stated that the initial wire was for $45,000. She agreed to take out a second loan: $40,000 from USAA. After that, she claimed that communications deteriorated. She agreed that he made 6 payments towards the loans but he indicated that he didn't have enough to make the following payments. He stated he would have the money soon.

On cross, she agreed that she received about $6-7000 from Defendant. Rec. at 765. She agreed that she applied for the loan while outside of Virginia and then came back to pick up the money. She was in California when she applied for the second loan. Id. at 768. She also did a second wire transfer.

Robert Dayton testified next. Rec. at 785. He advised that the last four digits of his SSN were 3133 and that he had owned an Amex card. He reviewed Amex card records and identified his SSN as being associated with Defendant. He agreed that he wasn't aware of the issue until being contacted by Amex and he wasn't aware of any negative impact to his credit as a result.

The government next called Joel Schwartz, previously manager for Bluff my Call, a phone spoofing app. Rec. at 789. The app allows a user to enter a phone number that the person is calling from instead of the actual number. Users were assigned their own PINs. He identified a user named Brian Williams, and agreed that user don't need to provide proof of ID to register.

Chyna B. testified that she met Defendant in 2018. Rec. at 797-798. Defendant introduced himself as Myles. They were in a serious relationship and discussed marriage and having kids. She recalled that he offered to pay off her credit card, but also discussed that the IRS had frozen his accounts. He said he was waiting to cash in some stock in Dominion Sugar that he had inherited. Id.

at 804.  The relationship was good at this point and Defendant was treating her well.  They took out

a personal loan at Bayport, in person at the branch.  Id. at 805.  She said that Defendant told her to

say she was employed at UPS and she listed that on the application.  Id. at 807.   She also identified a

UPS paystub as having been given to her by Defendant.  Id. at 811.   The loan was approved for

$2500.  She opened a PO box.  Id. at 812.  She took out another loan at regional Finance, in person

at the branch, with Defendant outside in the car.  Id. at 815.  The loan was approved for $2448, again

by using false employment information.  Id.  She said that once she started getting denied, she and

Defendant began to fight more frequently.  They applied for a First Viginia loan as well, in person

again.  She said that Defendant used her Target credit card and charged $500 to it.  Defendant had

her Wood Forest login, and overdrafted her account.  She claimed to have seen a gun laying on a bed

one night when they were at a hotel.  Id. at 823.   Defendant gave her a blank, signed check to repay

the Wood Forest debt, but she did not use it.  They went to the Honda dealership to get Chyna a car

but the loan application wasn't approved.   Id. at 823.  The relationship ended when she found

Defendant with another woman.   After the relationship ended, they still communicated about the

outstanding debts.  Id. at 827.

She agreed that they had a good relationship and Defendant didn't mention her credit until

they'd been dating about a year.  Rec. at 829.  She knew it wasn't true that she worked for UPS, and

she knew it was wrong to lie on the application.  Id. at 831.  She agreed that she saved that information

so she could use it again in the future.  She signed and initialed in many places on the Regional loan

application.  She agreed that she asked Defendant for further false information beyond what he had

originally provided.  She agreed that they both used the Target card, and that she was fine with him

using it.  Despite her earlier testimony, she denied that he had access to her Wood Forest account.  Id

at 841.  She said that she only saw the supposed firearm one time and that he never pointed it or

threatened her with it.  Id. at 841.  She agreed that, although she claimed she was always asking him

for money, on a recorded call with Defendant after they had separated, she spoke with him cordially for several mintes and never mentioned money once.

Lavett B. testified that she met Defendant in 2021. Rec. at 849. He introduced himself as Myles. She understood him to rehab houses for a living and that he was well-off. Id. at 852-854. They had a very good relationship and they dated until February 2023. Id. Eventually, they began discussing financial matters and they discussed her learning how to invest in houses. Defendant suggested that she get a Mercedes GLE but she wasn't interested at that time. Id. at 858. In September 2021, Defendant advised Lavett that his accounts had been frozen by the IRS for an audit. He said the problem was with an old accountant, but he had hired a new one, named Samantha. Id. at 859. Defendant asked her for a loan until he could unfreeze his assets and offered to buy her the GLE as a gift. They applied for a personal loan through NFCU. She got a new NFCU credit card and gave it to him and allowed him to use it. Id. at 861. He paid the bill on it initially. In September 2021, she applied for a personal loan for him at NFCU. She applied online and used the information he gave to her. They were approved for a $34,000 personal loan. She also wired him $25,500 from the personal loan. She withdrew some of the money for him and he was able to withdraw himself because he had the card.

In September 2021, Defendant suggested that Lavett get a GLE 350. Rec. at 866. Although she didn't want the car, she went through with and applied for financing. She completed that application herself. Defendant drove her to the bank to pick up the check. After she signed the check, Defendant advised that the car was ready in Arlington. They left the check at his house though because he said that Mercedes had better financing rates so they would apply for that instead. They met with Davis at the dealership. Her name and email address and address were on the buyer's order. The car cost $115,023 which Defendant said he would pay. Lavett reported Defendant said that they were over if she didn't take the car. She drove the car back and Defendant flew. Shortly thereafter,

she received an $85,000 wire transfer into her Wells Fargo bank account from Wholesale Direct. She denied that she used any of the money herself. Defendant diligently paid on the accounts until February or March 2022. Id. at 874. Defendant sold her old car for her for $5000 and soon asked her for $3000. She described the relationship as fine at that time. Id. at 875.

In November 2021, they also purchased a 2022 Mercedes through Chartway. Rec. at 876. They applied together online. This car was intended to be his and sold for $118,224. She tried to sell the cars later on. Ultimately, Defendant agreed to help her sell the cars. He was unsuccessful in selling the GLE. They went to buy a Honda Accord which was financed at PNC. She inputted information given to her by Defendant into the application and she omitted debt information, also at Defendant's suggestion.

The government produced an application for a Bentley through Ally which bore Lavett's information, yet she denied that application. Rec. at 883. Lavett helped Defendant apply for a Range Rover at Carmax in Staunton. The Range was listed in her name because his assets were frozen. She recalled personal loans at First Advantage ($34,000), Langley (, Chartway, and NFCU. Once she received the loans, he asked her to wire some of the funds to Camp Investments. Id. at 889.

They applied for an Amex card in October 2021. Rec. at 890. She received the card and then put his name on the account so he could get his own card. She added him as an authorized user on a phone call where both were present. She said she didn't have access to the Amex records.

She described an incident wherein Defendant told her he had shot up someone's house and then called a cousin to verify it for her. Rec. at 896. In February 2023, he asked for $30,000 for some issue dealing with the US Marshals. By her accounting, Defendant owed her $500,000 in loans at that point. She claimed that she loaned him $104,000 sometime in the course of the relationship. She ultimately filed for bankruptcy. Rec. at 901, Ex. 728.

On cross, Lavett agreed that they were dating about two months before Defendant made any mention of financial problems. Rec. at 902. She denied that she partly viewed her dealings with Defendant as also a business opportunity, given that she was interested in investing. But, she also admitted to texts indicating that she was all-in to the totality of the relationship. She agreed that the NFCU loan was always intended for Defendant. She agreed that she included her own LLC information on that application. Id. at 909. She agreed that he paid at least $ 5000 on the GLE. He was paying $2000 a month for several months towards other bills. She stated that they would apply for loans online while sitting together, and she agreed that she was willing to sign off on whatever loan application there was, regardless of whether the information was accurate or not. Id. at 921. She denied applying for the Range Rover, despite being shown a June 2023 government memo stating that she said she applied for it. Id. at 928.

Kaliyah D. testified that she met Defendant when she was 19. Rec. at 938. He introduced himself as Myles. They dated for two years. Id. at 940. Defendant broached the subject of money 3 to 4 months into the relationship and said his assets were frozen. Id. at 942. She said she gave him a $2500 loan and $500 cash advance. Id. at 945. She took out a $3500 NFCU loan for him and did the application herself. Id. at 948. She sent him her paystub from Massage Envy. She took out a $2000 Bayport loan for him as well. She used a paystub she had received from Defendant that contained fraudulent information. Id. at 954.

On cross, Kaliyah agreed that Defendant explained to her that Dion was his first name, but that he went by Myles. Rec. at 958. She agreed that he initially asked only for $500 not thousands as she had previously stated. Id. at 960. She agreed that they planned to split the first loan but maintained that he kept it all. She knew the information on the paystub was incorrect when she submitted it. Id at 965.

Sarah Amerson, FBI Tactical Specialist, was the government's next witness. Rec. at 969. She monitored Defendant's jail calls, tablet visits, and texts from the tablets. In particular she described a series of phone calls made by Defendant to Exeter Finance. Defendant was on a three way call with a female and a male friend, Lloyd Vaughn. They discussed the BMW Defendant had bought for Vaughn possibly being repossessed. They called Exeter Finance to request an extension of the loan due date. Mr Vaughn made a payment on the loan. Because he was incarcerated, Exeter offered Defendant a deferment plan. Id. at 980.

Sydney Lee, FBI Special Agent, was involved in analyzing the devices and digital data in the case. Rec. at 993. She testified that all the devices appeared to be used and controlled by Defendant. On the devices, agents found documents associated with financial transactions in the names of the Jane Does and Defendant. The devices contained email addresses linked to Defendant. Id. at 1013. There was an Apple receipt for the Burn Phone Number app. Id. at 1032. There was an Oakengate application and tax returns. Id. at 1037. There were numerous receipts for high end items. Id. at 1044.

Peter Boresky, Global Security Manager for Amex, testified next. Rec. at 1084. He described the online process for applying for a card. He stated that Defendant was a member. There were two birthdates listed for him, both with the same SSN. They were closed by 2016. He identified Rachel N. as a member, with Defendant being later added as an authorized account manager and supplemental card holder. He stated that the account holder had to call and add the person over the phone. He noted that provision of SSN for the secondary users wasn't necessary because the account holder was ultimately responsible for the account. Id. at 1090. He stated that the SSN provided in the supplemental account, 3133, differed from the SSN on Defendant's older account, 1663. He confirmed that the supplemental was removed in December and that Rachel N. took out a fraud complaint at some point. He also identified Amex accounts belonging to Lavett B., Jamila W. Jamika

B., Jaleesa M., all with Defendant as supplemental card holder and SSN ending in 3133. Rec. at 1094-1103.

On cross, he agreed that Amex requires much less information from supplemental card holders and authorized account managers. Rec. at 1106. He agreed that they issued a new card once Rachel N. reported fraud. Id. at 1113. He agreed that Lavett B. requested a supplemental card be sent out and later canceled. Id. at 1115.

Jamika B. testified that she met Defendant when she was 14. Rec. at 1118. They had a brief relationship and then reconnected as adults. She understood him to flip houses. He brought up financial matters a few weeks into the relationship and mentioned his accounts were frozen. She agreed to open several personal loans with NFCU, Lendmark, Mariner, First Advantage, Langley, and One Main Financial. Id. at 1121. She identified a promissory note between her and Defendant for $25,000. She completed the loan applications and he provided information. She requested certain information herself as well. Id. at 1125. She took out NFCU and Amex credit cards also. Id. at 1126. She said she gave both cards to him. She acknowledged using the card and claimed that Defendant was upset when he found out. Id. at 1131. She averred that he maxed out the $25,000 credit limit. She denied any awareness of the supplemental card having issued. Id. at 1131. Defendant got her a new car, although she already had her own car. She kept a spreadsheet of the loans and payments made and debt owed. She stated that Defendant left her with about $80,000 in loans. He did pay off the Amex card however. Id. at 1145. She filed an $80,000 lawsuit against Defendant but he did not appear.

On cross, she agreed that she had her own job, home, and car. Rec. at 1149. She agreed that she knowingly included false information on the NFCU and Lendmark loan application. Id. at 1150. She agreed that she said on October 23, 2021, that he had kept his word and wanted to know what she would be getting in return. Id. at 1155. She agreed he may have been making payments to her as

late as November 2021. She agreed that she received Zelle payments approximating $10,000 and other payments approaching $5000. Id. at 1159. Finally, she agreed that he paid off the $1400 balance on the Amex card.

Teresa Gillis, FBI field analyst, testified next. Rec. at 1166. She first discussed bank statements for Camp Investments's Bank of America account. Defendant was listed as president. The account usually carried a balance of around $500 although it fluctuated significantly over the course of the month. Often, the large deposits were from loan checks. Id. at 1171. She discussed Defendant's personal BOA, Wells Fargo, and Bayport accounts. Id. at 1173-1176. She reviewed bank records for Bryant, Wholesale Direct, and other associated accounts and provided charts to show the flow of money through them. Id. at 1179-1195. She opined that Defendant's use of the money typically involved quickly moving money through the accounts and then adding fresh money to keep them going.

She agreed that she saw Zelle payments made to Jamika B., Shatara S., Jamila W., Lavett B., usually in multiple hundred amounts. Rec. at 1198. She identified Zelle payments to Shatara S. around $3600. She agreed that the $85,000 to Lavett was sent but withdrawn by NFCU due to a fraud concern. Id. at 1202.

Shannon Newcomb, FBI Special Agent and case detective, testified next. Rec. at 1204. He testified to a storage unit owned by Defendant where a search warrant was executed. Inside, agents found numerous documents and receipts related to loans, auto purchases, cash withdrawals, and generally referencing the people and businesses pertinent to the case. Id. at 1208- . In addition, agents found paystubs for Jane Does and notes with writing and numbers matching several of the transactions in the case. Id. They also found evidence of owed child support. Id. He confirmed that the ghost-purchased cars were never purchased. Id. at 1239. He identified that several of the loan applications originated from Defendant's IP address. Id. at 1257.

On cross, he agreed that he couldn't state whether several particular documents were originals or copies. Rec. at 1263. He agreed that the notice to withhold accounts regarding child support issued in August 2021. Id. at 1264. He agreed that Defendant had paid thousands in child support after he entered into the payment plan.

Candi Holt testified first as defense witness. Rec. at 1276. She met him in August 2022 and they were in a relationship. Id. She admitted she also took out a loan for Defendant but she denied that he forced her to. She did it to help him. She denied that he had ever assaulted her or threatened her or seen him with a gun. Id. at 1277. She stated that he made payments on the loan and that she let him use her cards. He also made payments on the cards.

On cross, she acknowledged that she literally unfroze one of her credit cards for Defendant. Rec. at 1278. She conceded that she had taken out about $73,000 in credits and he had only paid back $3000. She agreed that he had maxed out almost all of her credit.

On redirect, she confirmed that he was still making payments to her at the time of his arrest. Rec. at 1288.

Thomasena Askew testified that she met Defendant in high school and that they had children together. Rec. at 1289. She stated she took out five loans for him and that he made payments on them. He paid one off in full and he made payments to her for their children.

On cross, she acknowledged that she filed for bankruptcy at a certain point. Rec. at 1293.

On redirect, Thomasena A. denied Defendant had forced her to take out loans. Defendant paid for her bankruptcy proceedings. Finally, she stated that both cars they got were turned back in at his insistence. Id. at 1299.

Shanell Candelario testified as the final defense witness. Rec. at 1301. She met him in August 2022 and was currently engaged to him. She took out loans for him voluntarily. He paid on the loans

until his incarceration. Id. at 1303. She also denied any physical abuse, intimidation, or force in their relationship. They bought a Honda Pilot and Mercedes, but both were returned when he was arrested.

On cross, she agreed that she included false information on the One Main Financial loan application. Rec. at 1310. She also took a Mariner loan. She did several vehicle loans and again provided false information and submitted false paystubs. Rec. at 1310-1320.

## OBJECTIONS

Mr. Camp objects to the "Offense Conduct" section of the PSR and therefore, the related financial loss amounts and guideline calculations. Camp further disputes the government's assertion that a 2 point increase is proper here for the use of a dangerous weapon in connection with the offenses. 2B1.1(b)(16).

Maintaining his innocence means Camp objects to the offense conduct considered by the PSR. Camp disputes many of the witnesses' testimonies, but he objects most strenuously to the 16 level increase for amount of financial loss. 2B1.1(b)(1). Camp's base level is a 7, but that provision raises an offense level 16 points where financial loss exceeds $1,500,000. Camp maintains that such an amount is not sufficiently proven by the current evidence. Although the loan documents were repeatedly shown, with regard to repayments, the evidence was mostly the word of the complaining witnesses. To the extent they filed for bankruptcy or had other documentary evidence of their actual loss, little was offered at trial. Some of the victims listed in the PSR were never even mentioned during trial and therefore not subject to any level of confrontation, such as uncalled witnesses, local cities and bridges, VDOT, Monterrey Collections, Wal-Mart, 2420 N. Salisbury Blvd, and 2118 Usher St. In addition, it fails to account for the unknown amounts of money that Camp did repay to the women. For example, Ashley B. stated he paid her between $1000-5000 at some point but couldn't tell how much she received in total. Rec. at 66, 105. Jamila W. stated that Camp made payments but she couldn't give an estimate of how much. Lavett B. acknowledged thousands in payments, but could

not give a final accounting at trial. Id. at 909. She also detailed additional claimed losses to case detectives, to include more loans, credit cards, tolls, and auto insurance payments but some of those were never discussed during trial. ¶ 45. Zelle records were referenced in Ms. Gillis's testimony, Ex. 2337-1 et seq, and payments were shown in Camp's Bank of America statements. Ex. 2319-2321, but the rest was attempts to establish those numbers through the government witnesses. In short, it is virtually impossible to reliably establish these amounts, and therefore, the court should apply at most a 14 level enhancement, lowering his offense level to 31 or 135-168 months.

Camp further disputes that the §2B1.1(b)(16) enhancement should apply in this case for risk of death or serious harm or use of a deadly weapon in connection with the offense. There was no evidence during trial of any risk of death or serious physical harm, and certainly none tied to the offense. There is no credible evidence in the PSR of any risk of serious harm. The dangerous weapon prong is equally inapplicable because a) no direct evidence of such weapon, beyond one witness's testimony, was offered and b) even assuming such weapon existed, it was not used in connection with the offenses. Chyna B. testified that she saw a gun one time laying on a bed in a hotel room. Rec. at 841. Camp did not point it at her or threaten her with it. She never saw it again. Id. And Lavett B. described an incident where she says Camp told her he shot up a house at some point. Rec. at 896. But there is no evidence that this story affected her nor did she testify that she took any actions because of that story. As such, the enhancement is inapplicable here.

Finally, Camp also objects to the amounts contained in the Preliminary Order of Forfeiture, consistent with the valuation objections stated above.

## APPLICATION OF THE 18 U.S.C. § 3553 SENTENCING FACTORS IN SUPPORT

## OF A VARIANT SENTENCE

### Introduction

Pursuant to 18 U.S.C. § 3553(a), the sentencing court is directed to impose a sentence that is "sufficient, but not greater than necessary" to achieve the goals set forth set forth by Congress, including the imposition of a just punishment. In determining the minimally adequate sentence § 3553 also directs the court to consider, among other factors: (1) the specific nature and circumstances of the offense, (2) the unique history and characteristics of the defendant, (3) the need to foster deterrence and promote respect for the law, (4) the need to protect the public from further crime, (5) the need to address any educational, vocational, medical, or therapeutic concerns with respect to the individual defendant, and (6) the kinds of sentences available, including the ranges and category of offense. In assessing these factors, the statute further requires that the court consider the applicable sentencing guidelines. The court, however, "may not presume that the Guidelines range is reasonable," and instead "must make an individualized assessment based on the facts presented." Gall v. United States, 128 S. Ct. 586, 597 (2007), see also Rita v. United States, 551 U.S. 338, 351 (2007) ("[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."). The sentencing guidelines are merely "a rough approximation of sentences that might achieve § 3553(a)'s objectives." Rita, 551 U.S. at 350. Mr. Camp's advisory sentencing guidelines as currently calculated are 168 to 210 months, plus 24 months consecutive. As the arguments below bear out, a sentence of 135 months plus 24 months consecutive is the appropriate disposition in this matter.

The sentence itself is lengthy. It is serious. And it addresses all the goals and needs of sentencing, while still recognizing the individual circumstances of the offense, Mr. Camp's individual characteristics and background, and all of the other factors under §3553. In sum, a sentence of 135

months plus 24 months is entirely sufficient to serve the goals of sentencing and is not greater than necessary.

The Specific Nature And Circumstances Of The Offense

Certainly, the conduct described was extensive and resulted in financial harm to banking institutions, businesses, and to the women who committed these acts with him.  But, it is important to remember that Camp did not act alone.  Largely, the actions of the women were knowing and voluntary.  (e.g.: Ashley B. Rec. at 70-71; Jamila W., Rec. at 220, 222; Stacey B., Rec. at 283; Naia J., Rec. at 630; Nadia F., Rec. at 768; Candi H., Rec. at 1277; Thomasena A., Rec. at 1298; Shanell C., Rec. at 1301)  The women involved had their own residences, jobs, and most had vehicles. (e.g., Stacey B., Rec at 265; Rachel N., Rec. at 467; Tylia B., Rec. at 657; Nadia F., Rec. at 745; Lavett B., Rec. at 850; Jamika B., Rec. at 1149).   Most denied any sort of physical abuse, with Rachel N. the main complainant in that regard. (E.g., Stacey B., Rec. at 276; Naia J., Rec. at 650; Tylia J., Rec. at 679; Candi H., Rec. at 1276; Shanell C., Rec. at 1303). None were dependent upon Camp when they embarked on the actions.  And they all recognized that they were signing fraudulent checks and including false information on loan applications. (e.g., Ashley B., Rec. at 74, 78, 85-86; Stacey B., Rec. at 280; Jamilah W., Rec. at 220; Naia J., rec. at 643; Tylia J., Rec. at 676; Nadia F., Rec. at 748;Chyna B., Rec. at 815, 831; Lavett B., Rec. at 909, 921; Kaliyah D., Rec. at 965; Jamika B., Rec. at 1150; Shanell C., Rec. at 1310). Again, while the conduct against the financial institutions was clearly wrong, it is important to nonetheless consider the full picture.

History and Characteristics of the Defendant

18 U.S.C. §3553's directive that the court must consider the unique history and characteristics of the defendant embodies the long-held principle that a sentencing court must consider the defendant's crimes not in a vacuum, but in light of his or her entire life.

Mr. Camp was born in Norfolk.. He did not live with either of his parents basically from birth. Camp learned who his father was when he was 8 and then he sporadically saw him. He had little contact with his biological mother, who was a drug user and overdosed twice during his pregnancy. ¶ 172, 174. While he has a few siblings, he did not have close relationships or regular contact with any of them. ¶ 173.

He was born when his mother was only 16 and was herself living in foster care. When she left the state, Camp came to reside with her foster mother, Lucy Cumber. Cumber adopted Camp at a young age and served the role of mother. After that, he had little contact with his biological mother. ¶174. When Ms. Cumber passed away in 2007, Camp began to live with his father. He attended church and played basketball. ¶ 174.

Camp is currently engaged to Shanell Candelario. He has 22 children (none by Candelario). ¶ 175. The mothers of several of his children indicated that Camp would financially support them. ¶ 186, 187, and at least one affirmed that he was a "good father". ¶ 186.[1]

Camp has suffered great personal loss while incarcerated. His cousin, Ronin Hill, was killed in the Virginia Beach Jail. See Death of a man restrained in a Virginia jail is homicide, authorities say, October 18, 2024, available at apnews.com. His aunt, Angela Ricks, passed away in August of last year. ECF 208. And his daughter, Jordyn, was recently and tragically killed in Jacksonville FL. See NAS Jacksonville sailor arrested after two women killed at Clay County home, December 18, 2025, available at firstcoastnews.com. Of course, Camp suffered the absence of his biological mother before he was even aware of her presence, and surely these events have affected him deeply.

Medically, Camp has sleep apnea and has struggled to get a CPAP machine in jail. He has long suffered from anxiety and depression. ¶ 198. He recently has sought mental health treatment while

---

[1] Camp did not have current contact information for most of the mothers.

incarcerated, experiencing nightmares after the death of his cousin. ¶199. During his competency restoration, doctors noted narcisstic tendencies, which can interfere with good decision making, and he was found to meet the criteria for an anxiety-related disorder. ¶200. He wants to pursue counseling to be more stable for himself and his children. ¶199.

Camp wants to further his education, as financial problems prevented his earlier endeavors to enroll in college. ¶206.

<u>The Need to Foster Deterrence and Promote Respect for the Law, and The Need to Protect the Public from Further Crime</u>

Congress further directs the Court to consider the need to foster deterrence and promote respect for the law, and also to protect the public from further crime. In regards to general deterrence, that is the deterrence of other individuals who may contemplate criminal behavior, that goal is met by the 159 month sentence recommended by Camp. The spectre of a 13 year prison sentence is terrifying, and any individual aware of that risk would likely think twice. The same arguments apply to specific deterrence as well. Mr. Camp will miss out on so much of his life while he is incarcerated. He will be absent for family gatherings, first moments, milestones, and countless other events where any person should be present. That pain to him will be sharp, and the potential for future pain will further serve as the specific deterrence required by a sentence. A sentence of 159 months will also serve simply as punishment, another goal of sentencing. Finally, the public will be protected from the risk of any potential further crime for 15 years. A sentence of 15 years is significant and lengthy. It is difficult to even fully comprehend that length of time away from one's loved ones and during that time the public is protected from potential for further crime on his part.

<u>The Need to Address Any Educational, Vocational, Medical, or Therapeutic Concerns</u>

Camp clearly has a detailed and in depth knowledge of cars, something we all need daily. That is something that, if used positively, could yield great prosperity to Camp. He is eager to take advantage of educational and mental health training available to him in prison. He already has much

to offer and will no doubt avail himself of those programs while awaiting his release back to society. When he does, he will emerge a better, if not older, man.

<u>The Kinds of Sentences Available</u>

Mr. Camp will have access to classes and vocational training while incarcerated that will help ease the burden of finding a job as a convicted felon. Making it easier for him to get back to work will decrease his risk to reoffend. Most would agree that a shorter sentence correlates with a better chance of successful reintegration to society, and the sentence requested is the one most likely to ensure that Mr. Camp leads a law-abiding and productive life going forward.

## CONCLUSION

For the reasons outlined above, a sentence of 159 months followed by supervised release is sufficient but not greater than necessary to accomplish the goals of sentencing. *See* 18 U.S.C. § 3553(a).

Respectfully submitted,

By: ___/s/_____

Roger A. Whitus
Slipow & Robusto, P.C.
2476 Nimmo Pkwy, #121
Virginia Beach, Virginia  23456
757-427-5094
757-427-1727 (facsimile)